# UNITED STATES *v.* ELLICOTT.

## APPEAL FROM THE COURT OF CLAIMS.

No. 85. Argued December 7, 8, 1911.—Decided February 26, 1912.

The general rule governing appeals is applicable to appeals from the Court of Claims.

A judgment is not generally treated as final until a motion for new trial or rehearing, which has been entertained by the court, has been disposed of; in such a case the time for appeal runs from the date of such disposition. *Kingman* v. *Western Manufacturing Co.,* 170 U. S. 675.

When there is an irreconcilable conflict between essential provisions of a contract for building and the specifications, and the latter cannot be ignored, the contract is void for uncertainty and unenforceable.

Where a bid has been accepted for government work after the advertisement necessary to give it validity, and the final contract contains specifications materially lessening the work and at variance with the terms of the contract as advertised, the contractor cannot recover damages because the Government abrogates the contract;

if the specifications are not binding on the Government, the contractor has no basis for recovery, and if they are binding the contract varies from the one advertised for and has no validity; and so held as to a bid for barges for the Panama Canal Commission.
44 Ct. Cl. 127, and 45 Ct. Cl. 469, reversed.

THE facts, which involve the construction of a contract for dredges for the Panama Canal and the liability of the United States for damages for abrogation of the same, are stated in the opinion.

*The Solicitor General,* with whom *Mr. Barton Corneau* was on the brief, for the United States:

This appeal was prayed in apt time.

The entry and entertainment of the motion for a new trial suspended the judgment itself, and not merely the running of the limitation as to appeals. The effect of the motion was to make the judgment a mere order *nisi,* not only from the time the motion was entered, but from the date of the judgment itself. The entertainment of such a motion relates back to the date of the rendition of the judgment.

In *Brockett* v. *Brockett,* 2 How. 238; *Memphis* v. *Brown,* 94 U. S. 715; *Aspen Mining & Smelting Co.* v. *Billings,* 150 U. S. 31; *Voorhees* v. *Noye Mfg. Co.,* 151 U. S. 135; *Kingman* v. *Western Manufacturing Co.,* 170 U. S. 675, 680, 681, a final judgment, and not merely a verdict, had been rendered, so that the appellee's suggestion that a special rule applies in the case of appeals from judgments of the Court of Claims, because the motion for a new trial is not made in such court until after final judgment, is without merit.

The writing executed by the parties expresses with seeming clearness an agreement for the construction of barges of the dimensions shown on the plan, but of materials of the size, weight, and character prescribed by the specifications; and the fact that such construction

would require barges of greater weight than was noted on the plan should not be permitted to alter the plain meaning of the language used. *Garrison* v. *United States*, 7 Wall. 688.

When the terms of a promise admit of more senses than one, the promise is to be performed in that sense in which the promisor apprehended at the time the promisee received: such is the established rule at law, as well as in morals. *White* v. *Hoyt*, 73 N. Y. 505, 511.

The construction here urged is necessary to sustain the validity of the instrument, for either that construction or the one urged by appellee must be adopted if the instrument is to be given any meaning at all; and if the latter construction (that is, the one urged by appellee) should be adopted, the instrument would be void because the Commission would have had no power to make such a contract.

At most the impossibility of constructing a barge of the proposed dimensions and specified materials without exceeding the weight noted on the plan only renders the meaning of the writing ambiguous and imposes on the court the duty to ascertain by extrinsic evidence the true intent of the parties. Accordingly, the Court of Claims erred in holding as a matter of law that it was immaterial in this case whether or not the evidence showed that the minds of the parties never met. *Walker* v. *Tucker*, 70 Illinois, 527, 532; *C. & O. Canal Co.* v. *Hill*, 15 Wall. 94; *Moran* v. *Prather*, 23 Wall. 492; *Reed* v. *Insurance Co.*, 95 U. S. 23.

If the instrument must be construed as evidencing an agreement to construct the barges of lighter and smaller materials than those specified, it is absolutely void, because the Canal Commissioners had no authority to make a contract for the construction of a barge which did not conform, at least substantially, with the specifications as to the weight and size of materials. See § 3709, Rev. Stat.;

Act creating the Isthmian Canal Commission, § 7, 32 Stat. 481; Joint resolution approved June 25, 1906.

This case does not fall within the exceptions to any of the foregoing declarations of the rule requiring the letting of contracts of the present sort only after competitive bidding. *Dist. of Col.* v. *Bailey,* 171 U. S. 161; *McMullen* v. *Hoffman,* 174 U. S. 639; *Whitney* v. *Hudson,* 69 Michigan, 189; *Nash* v. *St. Paul,* 11 Minnesota, 174; *Overshiner* v. *Jones,* 66 Indiana, 452; *Wickwire* v. *Elkhart,* 144 Indiana, 305; *People* v. *Board of Improvement,* 43 N. Y. 227; *People* v. *Van Nort,* 65 Barb. 331.

*Garfield* v. *United States,* 93 U. S. 242, is not pertinent.

The Commission had no authority, without readvertising, to enter into a contract for barges of a radically different type from those originally specified. *Fones Hardware Co.* v. *Erb,* 54 Arkansas, 645; *Mazet* v. *Pittsburgh,* 137 Pa. St. 548; *Chippewa Bridge Co.* v. *Durand,* 122 Wisconsin, 85; *Packard* v. *Hayes,* 94 Maryland, 233; *Detroit Free Press Co.* v. *Auditors,* 47 Michigan, 135; *Littler* v. *Jayne,* 124 Illinois, 123.

Even if the writing in question constituted a valid contract to construct the barges of lighter and smaller material than those specified, yet under all the facts and circumstances of the case such contract was unconscionable. In no event, therefore, was appellee entitled to more than nominal damages. *Hume* v. *United States,* 132 U. S. 406, 412, citing *James* v. *Morgan,* 1 Lev. 111; *Thornborow* v. *Whitacre,* 2 Ld. Raym. 1164; *Baxter* v. *Wales,* 12 Massachusetts, 365.

*Mr. James Piper,* with whom *Mr. Francis K. Carey* and *Mr. A. A. Hoehling, Jr.,* were on the brief, for appellees:

An appeal in this case was not applied for by defendant within ninety days after the date of the judgment; and the appeal prayed for and allowed was not from the judg-

ment that was entered in the case, but was merely from the order overruling the motion for a new trial.

The only judgment from which appellant could properly appeal is the final judgment of the Court of Claims, and no appeal will lie to this court from a mere order of the Court of Claims overruling the motion for a new trial. *Kellogg* v. *United States*, 19 Ct: Cl. 73; Court of Claims, Rule 107.

Appellant could have filed at any time within ninety days thereafter an application for the allowance of an appeal, and such application would have temporarily suspended the further running of the time incident to the filing, consideration and disposition of a motion for a new trial. *United States* v. *Ayres*, 9 Wall. 609; *Roberts* v. *United States*, 15 Wall. 384; Rules relating to appeals from the Court of Claims.

To require an appellant to prosecute its rights within the statutory period would impose no hardship upon the losing party; whereas, to support the contention that, at its own pleasure, the defendant party may absolutely revive the entire statutory period of ninety days by the filing of successive motions, is contrary to the language of the statute and would impose a great wrong and an unnecessary hardship upon the rights of appellee, as so adjudicated by the court.

The judgment should be affirmed.

The Court of Claims found there was a valid contract that the United States breached, whereby appellee was entitled to recover damages; these findings of fact are conclusive, and the only question proper for review by this court is whether or not the conclusion of law thereon and the entry of judgment by the court in accordance therewith, is supported and justified by the facts as so found.

The record discloses that there were successive advertisements made by defendant for procuring these barges

because of the fact that the bids were in greater amount than defendant desired to pay therefor. The present contract, under a bid which was satisfactory in price to defendant, was entered into, but, while not in any way departing from or changing the subject-matter of the advertisement or specifications, did provide for a barge lighter in framing and plates.

The advertisement simply called for proposals for furnishing and delivering six steel dump barges; hence no contention can be made by defendant that there was any departure in the contract from the subject-matter of the advertisement.

So long as the subject-matter of the advertisement and specifications be not departed from, there can be modifications or changes in respect of mere detailed matters incident to such subject-matter. *International Co.* v. *United States*, 13 Ct. Cl. 209; *McKee* v. *United States*, 12 Ct. Cl. 504.

The Isthmian Canal Commission has authority in law to make a valid contract the terms of which modify the exact terms or specifications accompanying an advertised circular asking for proposals for work and materials.

As for the reasons for public advertisement and awarding the contract to the lowest bidder, see Dillon, Municipal Corp., 5th Ed., 1911, §§ 802, 809.

There was no statute requiring the Isthmian Canal Commission to advertise for bids and to award contracts to lowest responsible bidder. The requirement rests on a communication addressed to the Commission by the President on April 1, 1905, p. 483 Proceedings of the Isthmian Canal Commission, in response to which the Commission adopted a set of resolutions, p. 492 Proceedings, which embodied the same language in regard to letting contracts as contained in the President's communication.

Resolutions passed by the Commission could be altered

by the Commission. They have not the binding effect of a statute.

Granting that the appellees were charged with notice of the resolution, it is general in its terms. No time for advertising is mentioned nor what the advertisement should contain, which certainly indicates that the Commission did not intend to restrict itself. Section 3709, Rev. Stat., does not impose the limitations on the Commission required to support the Government's contention.

The members of the Isthmian Canal Commission are not "ministerial agents," comparable to agents acting for a city or State in carrying out a defined piece of work in a limited and defined manner.

There was a sufficient advertisement to promote economy and there was no fraud or collusion.

The modification was not so material that the barges contracted for were not advertised.

These questions are not now open for review.

Convenience requires that the government officials should be allowed some latitude to modify specifications annexed to advertisements when the contract is made and also to modify a contract after it is made.

The Government is contending for a decision which will make it impracticable to carry on its business. Modifications are the rule. The Government is pleading a technical disability contrary to what might be called the good business faith of the situation, and, like all pleas of this character, it is necessary that the disability complained of should be clearly established.

In *Harvey* v. *United States,* a case which was heard four times in the Court of Claims and twice in this court, 8 Ct. Cl. 501; 12 Ct. Cl. 141; 13 Ct. Cl. 322; 105 U. S. 671; 18 Ct. Cl. 470; 113 U. S. 243; under similar conditions to this the Supreme Court apparently adopted the lower court's theory that the contract was not invalid on account of a departure from bid and specifications, but held

on equitable grounds that it should be reformed on account of having been entered into by mutual mistake.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Whether or not the United States is responsible in damages because of a refusal to permit the carrying out of an alleged contract made with a co-partnership, the Ellicott Machine Company, who are appellees, for the construction for the Isthmian Canal Company of six steel dump barges is the issue here required to be decided. From a judgment for ten thousand dollars entered in the Court of Claims, in favor of the Ellicott Machine Company, because of the refusal referred to, the United States took this appeal.

It will conduce to a clear understanding of the controversy to fully summarize the facts found below, and we proceed to do so.

After two unsuccessful attempts to procure satisfactory proposals for the construction and delivery of the six steel dump barges, the Isthmian Canal Commission, by advertisement and specifications, dated May 29, 1906, invited the proposals which culminated in the making of the alleged contract. One of the clauses of the advertisement reads as follows:

"Preliminary inspection will be made at the point of manufacture or purchase to determine whether the material meets the requirements set forth in the specifications and final inspection will be made at the point of delivery as above."

\*     \*     \*     \*     \*     \*     \*     \*

In the specifications, among other things, it was recited as follows:

"The following specifications and requirements are general only as indicating the class of construction desired.

"Barges of heavy construction for rough service, built in accordance with best modern marine practice, are desired.

"Bidders will be required to submit with their proposals plans in sufficient detail to show the proposed size of members and details of construction."

\*     \*     \*     \*     \*     \*     \*     \*

"The breadth of the barges should not be less than 25 feet nor more than 32 feet. They should have sufficient depth and length to carry a full load of sand on a draft of not more than 8 feet, and with not less than 30″ freeboard when loaded. They will be rectangular in plan, with rake at each end about 11″ long. . . ."

As shown by an excerpt in the margin,[1] the weight and

---

[1] FRAMING.

Floor beams forward and aft of the hoppers and in the rake should not be less than 10″ deep and extend in one piece to the turn of the bilges. They will be spaced 24″ center to center. Frames to be not less than 3 1/2″ x 5 3/8″ angles overlapping the floors not less than 18″ and connected with them and to floor beams with proper gusset plates. Bilges to be of as short radius as it is practicable to bend the angles and plates.

In addition to the transverse bulkheads mentioned above there will be a watertight bulkhead at each end of each rake.

Transverse water-tight bulkheads will be made of 10.2 pound plate with double-riveted lap joints, stiffened with vertical angle bars 3″ x 3″ x 5 1/6″ spaced 2″ apart, except that the plates forming the ends of the hoppers will be of 21-pound plate, stiffened with 4″ x 4″ x 3/8″ angle bars spaced 2′ apart.

In the space forward and aft of the hoppers there should be a central longitudinal bulkhead of 10.2-pound plate, fastened at the top of the floor beams and deck beams by 4″ x 4″ x 3/8 ″ angle; it will be stiffened by vertical 3″ x 3″ x 5/16″ angles, spaced 2′ apart. This bulkhead should extend from the hoppers to each end of the barges.

In addition to this bulkhead there will be 2 longitudinal lattice trusses, one on each side midway from the center bulkhead to the side of the hull. They will have top and bottom cords of 3″ x 3″ x 5/16″ angles riveted to each floor and deck beam, lattice bars to be 3″ x 3″ x 5/16″ angles made in double panels and joined top and bottom with

dimensions of the structural materials were prescribed with much detail under the head of "Framing." In reply to this advertisement appellee submitted a proposal to construct the desired barges, "subject to specifications of Circular 310–C, with such modifications as are here shown on drawing No. 2105, dated June 7, submitted herewith." The plan referred to, as so submitted, showed the outline of a barge 101 feet 4 inches long, 30 feet wide, and 10 feet 6 inches in height, and a note on it read as follows:

"Capacity of Bins—350 Cu. Yards. Maximum Loaded Draft When Carrying 350 Cu. Yds. Of Material Weighing 3240 Lbs. Per Cu. Yard, Not to Exceed 8′—0″."

After examination of the bids by F. B. Maltby, Division Engineer on the Canal Zone, that official returned the bids to the general purchasing officer of the Commis-

---

proper gusset plates with not less than 3 rivets in each landing. These trusses will extend from the hoppers to the rake.

In the rake there should be a 3″ x 3″ x 3/8″ angle stanchion secured to each deck beam and floor timber on line with the said trusses.

Deck beams to be of 5″ x 3/8″ **Z** bars spaced one to each frame, each beam to be attached to its frame by 5/16″ gusset.

Gunwales to be not less than 4 1/2″ x 4 1/2″ x 7/16″ angle running inside the side plating and below the deck.

The hull plating should be 21-pound on the bottom; bilges should be 21-pound; the side plating may be of 18-pound plate and in not more than 2 streaks.

The deck should have a checkered stringer streak on each side 30″ wide and about 7/16″ thick; remaining deck may be of 15-pound plating.

All plating to be worked "in" and "out" on longitudinal streaks; longitudinal laps to be double-riveted. All girth seams to be double-riveted to butt straps.

There should be a nosing or fender streak of 8″ x 8″ yellow pine, supported by 4″ x 4″ x 3/8″ angles top and bottom. This nosing should extend entirely about the barge. On each side of the full length there should be a second fender streak of the same section about 3′ below the deck.

sion in Washington, accompanied by a letter dated June 26, 1906. Therein, among other things, Mr. Maltby said: "It is noted that the drawing submitted by the Ellicott Machine Works does not show any detail, as required by the specifications. It is assumed, however (and we should insist on it), that the framing will be in strict accordance with our specifications." A sketch was inclosed "showing the desired arrangement of the hinges on the. hopper doors and the method of securing timber lining to hoppers," and various suggestions were made explanatory. of the details shown on this sketch. Thereupon D. W. Ross, purchasing officer, prepared and transmitted to the Ellicott firm a draft of contract for the construction and delivery of the barges, but it was returned with the suggestion that article 1 thereof be rewritten, so as to provide for the construction of—

"six steel dump barges in accordance with specifications contained in Circular No. 310–C of the Isthmian Canal Commission, dated May 29th, 1906; with such modifications as are shown on drawing No. 2105, dated June 7th, 1906, and subject to such amendments as to details of hinges, hoisting gear and method of securing timber lining to hoppers, as are described by letter of F. B. Maltby, division engineer, dated June 26th, 1906, with the accompanying sketch, a copy of which specifications, drawing, letter and sketch are attached herewith and form part of this contract."

In the letter returning said draft of contract, it was stated that—

"our drawing No. 2105 was not intended to show working details, but solely to limit the conditions of displacements, load, and draft. As long as these are maintained we shall be pleased to follow such reasonable design of working details in arrangement and distribution of material as Mr. Maltby or his inspector may require."

Claimant also, at the request of said Ross, addressed

a letter, dated July 27, 1906, to Maltby, in which it submitted—

"print # 2105 revised July 27th, specifying details as called for in your letter June 26th, 1906, of hinges, hoisting gear and method of securing timber lining to hoppers."

In said letter, this statement also was made:

"We have also inserted on the drawing a schedule of displacement, load and draft showing a total net weight for the barge of 260,000 pounds. You will note that this corresponds with the note shown on print originally submitted with bid, and this weight may be distributed in any way your representative may desire."

The alleged contract, the subject of this controversy, was then executed, F. P. Shonts, chairman of the Commission, signing for the party of the first part. Following a recital that "the Isthmian Canal Commission, for and on behalf of the United States of America and the said Ellicott Machine Company, had covenanted and agreed, to and with each other, as follows." The first article of the contract was inserted, reading as follows:

"Article 1. That the said Ellicott Machine Company shall construct, erect, and deliver to the Isthmian Canal Commission at Baltimore, Maryland, six (6) steel dump barges, in accordance with specifications contained in circular 310–C of the Isthmian Canal Commission, dated May 29th, 1906, with such modifications as are shown on drawing No. 2105, dated June 7th, 1906, and revised July 27th, 1906, outlined in letter of Ellicott Machine Company dated July 27th, 1906, and subject to such amendments as to details of hinges, hoisting gear, and method of securing timber lining to hoppers as are described by letter of F. B. Maltby, division engineer, dated June 26, 1906, with accompanying sketch, copy of which specifications, drawing, letters, and sketch are attached hereto and form a part of this contract."

It was provided in article 3 as follows:

"Article 3. That the party of the first part, by its duly authorized agent, shall have the right to inspect at any time during the process of construction of these barges, any and all material and workmanship used, or to be used, in said construction, and such inspection of said barges, and of the material used, or to be used, in the construction thereof, and of the workmanship thereon, may be made by the party of the first part, or its duly authorized agent, at any place where said materials may be found, and at the places of construction of said barges. In addition to the above, when said barges, or either of them, are pronounced by the party of the second part to be completed and ready for final inspection, such inspection may be made by the party of the first part, by its duly authorized agent, at the place or places where such barges, or either of them, have been constructed, such inspection being for the purpose of determining whether the same, or either of them, meet the requirements set forth in the letters, specifications, and blue print mentioned in article 1 hereof and all of said inspections, whether preliminary or final, the party of the first part, by its duly authorized agent, shall have the right to reject any and all material used, or to be used, in the construction of said barges, or either of them, or in the workmanship thereon, when, in the judgment of the party of the first part, by its duly authorized agent, the same or any part thereof, does not conform to the requirements above mentioned."

In article 8, among other things it was provided as follows:

"The barges herein contracted for shall be completed in accordance with the specifications, letter, and blue print annexed hereto and made a part hereof, . . . ."

By article 9 it was agreed that payment would be made of the stipulated price for the six barges "upon their construction and delivery in accordance with the terms of this contract and the papers attached hereto."

It was provided in the last article of the contract as follows:

"Article 12. If, at any time, during the prosecution of this work, it shall be found advantageous or necessary to make any change or modification in said barges, or either of them, and this change or modification should involve such alteration in the specifications as to character, quantity, and quality, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices both of material and labor thus substituted for those specified in the original contract, and before taking effect must be approved by the chairman of the Isthmian Canal Commission: Provided, That no payment shall be made unless such supplemental or modified agreement was signed and approved before the obligations arising from such modification was incurred."

Two days after the execution of the contract claimants presented to the Government inspector of dredges a list of materials intended to be used by them in the construction of said barges, but upon examination of said list it was found by said inspector of dredges that the dredges which the claimants proposed to construct were different from those described in circular letter and specifications 310–C, set forth in the petition, the principal component parts or members being reduced in weight, size and power of resistance, and thereupon the same was disapproved by the officers of the Government. Demand was thereupon made that the claimants should adhere to the original specifications, which they refused to do, and as a result, the United States abrogated the contract.

Soon afterwards this suit was commenced. By the petition judgment for thirty thousand dollars was de-

manded as the "gains and profits, which claimants would have made had they constructed the barges in accordance with the contract as the terms of that instrument were construed by the contracting firm." The Court of Claims, as already stated, gave judgment against the United States for the sum of ten thousand dollars. There is no statement in the findings as to the loss sustained by the claimants. Evidently, however, the conclusion to award the sum stated was based upon the hypothesis mentioned in the closing paragraph of the opinion of the court below, reading as follows:

"In consideration of all of the facts in the case, and in view of the difference between the cost of doing certain work and what claimants were to receive for it, making reasonable deduction of the less time engaged and release from the care, cost, risk, and responsibility attending a full execution of the contract, the court decides that claimants are entitled to recover as profits the sum of $10,000, and accordingly judgment against the defendants for said amount is hereby ordered."

A motion to dismiss the appeal first requires attention. The facts are as follows:

The judgment against the United States was entered on May 18, 1908. Eighty-four days afterwards, on August 10, 1908, defendant filed a motion for a new trial. This motion was argued and submitted on November 23, 1908, and was overruled on January 4, 1909, in the term which began on December 7, 1908. Seventeen days afterwards, on January 21, 1909, the United States filed a motion to amend the findings of fact; on February 8, 1909, the motion was argued and submitted; and on February 15, 1909, the motion was overruled in part and allowed in part. Ten days afterwards, on February 25, 1909, the United States made application for and gave notice of an appeal "from the judgment rendered in the above entitled cause on the fourth day of January, 1909."

The grounds for the motion to dismiss are these: (*a*) that the appeal was not taken within ninety days after judgment, (Rev. Stat., § 708), and (*b*) that the appeal prayed for and allowed was not from the judgment of January 4, 1909, "but was merely from the order overruling the motion for a new trial."

The motion is without merit. The general rule governing the subject of prosecuting error or taking appeals from final judgments or decrees is, we think, applicable to judgments or decrees of the Court of Claims, and that rule treats a judgment or decree properly entered in the cause as not final for the purposes of appeal until a motion for a new trial or a petition for rehearing, as the case may be, when entertained by the court, has been disposed of; and the time for appeal begins to run from the date of such disposition. *Kingman* v. *Western Manufacturing Company*, 170 U. S. 675, 680, 681. It is, we think, also manifest that the appeal was taken upon the hypothesis just stated that the judgment entered did not become a final judgment for the purposes of appeal until the motion for a new trial had been disposed of. *Texas & Pacific Railway Company* v. *Murphy*, 111 U. S. 488.

Coming to the merits. The claimant in effect reiterates in the argument at bar the position taken by the court below in the opinions by it rendered, reported in 45 Ct. Cl. 469 and 44 Ct. Cl. 127. We shall, therefore, dispose of the case by reviewing the opinions of the court below.

In the opinion delivered upon the original hearing it was observed that "the litigation in this case resulted from what seems to have been an apparent misunderstanding by the agents of the defendants, as to certain changes in the terms of an original advertisement for bids for the construction of the said six steel dump barges of a specified size, strength, and weight," etc. It was, however, held that the contract was clear and unambiguous in terms, and that the evidence revealed " a degree of negli-

gence on the part of the agents of the defendants from which they cannot be allowed to extricate themselves by the abrogation of a duly executed contract in order to shield themselves from responsibility." . The claimants, it was said, in their second bid, made part of the contract, had in detail specifically set forth the strength, weight and measurement of the barges, and that "the only difference in the barges which the claimant proposed in its contract to construct under its bid was a difference in weight of framing and plates from those contained in the advertisement of the defendant's circular No. 310–C." The claimants, however, it was further observed, had called the attention of the defendant to the great difference between its then bid and the prior bid, and before the execution of the contract had noted on the blue print submitted by them and attached to the contract "the net weight of the barges," and stated that "this weight was to be distributed in such manner as the defendants might instruct." The printed specifications, it was held, although made part of the contract, could not govern, since the letter of claimants of July 27 and the blue print would have to be entirely ignored. It was also said that the materials proposed to be used by the claimants in the construction of the barges, although "reduced in weight, size, and power of resistance" from those prescribed by the specifications, did not constitute "a substitution of different strength and material for those provided in the specifications of the defendant as to the manner of constructing the barges," but was "rather a modification thereof."

We have, however, reached the conclusion, as well from the fact that the specifications were expressly made part of the contract as from various provisions of the contract which we have excerpted that it cannot in reason be held that the specifications must be ignored, and as they cannot, therefore, be treated as having been abro-

gated, it inevitably follows that the alleged contract should have been held void for uncertainty.

It is, we think, in reason, impossible to construe the "modifications" referred to in the first article of the contract as having relation to the dimensions, etc., of the material so specifically described in the portions of the specifications embraced under the heading "Framing," since in that event a clear inconsistency would arise between the terms of that article and the terms of the specifications, also constituting part of the contract. And although this conclusion is, we think, so certain as to require no additional demonstration than the mere consideration of the terms of the two provisions, its conclusiveness is in addition convincingly shown by an analysis of the contract as a whole. The provision of article 3 in regard to the right of the Government at any time during the progress of the work on the barges to inspect all the material furnished clearly imports that the contract had precisely settled the character of such material. So also does the provision in the same article in regard to final inspection, wherein it is provided "such inspection being for the purpose of determining whether the same, or either of them, meet the requirements set forth in the letters, specifications, and blue prints mentioned in article 1 hereof, and all of said inspections, whether preliminary or final, the party of the first part, by its duly authorized agent, shall have the right to reject any and all material used, or to be used, in the construction of said barges, or either of them, or in the workmanship thereon, when, in the judgment of the party of the first part, by its duly authorized agent, the same or any part thereof, does not conform to the requirements above mentioned. Again, prominence is given in article 8 to the fact that, in the construction of the barges, the specifications are to be given effect, the provision being that "the barges herein contracted for shall be completed in accordance with the speci-

fications, letter and blue print annexed hereto and made a part hereof. . . ." So, also, in article 9, payment is to be made only when the barges have been constructed and delivered "in accordance with the terms of this contract and the papers attached hereto," of which papers the specifications formed a part. Article 12 also clearly negates the conception that it could have been intended by the parties that material parts of the specifications should be treated as not forming a portion of the contract, although declared by its terms to be a part thereof, since the binding efficacy of the specifications as to material is therein emphasized. The article, in substance, provided that no change or modification "involving an alteration in the specifications as to character, quantity and quality, whether of labor or material, as would either increase or diminish the cost of the work" should be made unless "agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, *and giving clearly the quantities and price both of material and labor thus substituted for those specified in the original contract,*" etc. Manifestly, this article was drawn upon the conception, not that the contract did not, but that it did, specifically provide as to what material should be furnished for the work, and no other source could be resorted to for light as to the material contracted to be supplied than the specifications which it is now urged ought by construction to be removed from the contract.

Thus viewing the contract as a whole and determining that the specifications so far as the "Framing" schedule is concerned should have been treated as unaffected by the provisions of article 1, it is evident that there was a conflict so irreconcilable between essential provisions of the assumed contract as to render it impossible to enforce it as an agreement between the parties. This result of the absolutely antagonistic and destructive character of essential provisions of the contract, one upon the other, can

only be escaped by indulging in one of two hypotheses, either that the terms of the advertisement and specifications as incorporated in the assumed contract overshadowed and virtually destroyed the proposals resulting from the bid of the claimant, which also was incorporated in the contract, or conversely that the proposals which the bid embraced had the effect of setting at naught the provisions of the specifications. But if the first assumption were indulged in, it would clearly result that there was no right to recover, since that right is based upon the theory that the specifications are not binding and need not be complied with; and if the second were indulged, the same result would follow, since it would then come to pass that the contract was so irresponsive to and destructive of the advertised proposals as to nullify them, and therefore cause it to result that the contract was one made without the competitive bidding which was necessary to give it validity.

Under the circumstances, therefore, the court erred in treating the contract as a valid agreement and in awarding judgment against the United States.

*Judgment reversed.*