**MORTGAGE LOAN CO. et al. v. LIVINGSTON et al.**

**In re BUCKINGHAM REALTY CO.**
**No. 8942.**

Circuit Court of Appeals, Eighth Circuit.
Nov. 20, 1930.

Paul Bakewell, Jr., of St. Louis, Mo., for appellants.

Harry A. Frank, of St. Louis, Mo., for appellees.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal by the mortgagees and the trustee under a second mortgage covering property referred to in the record as the Buckingham Hotel, situate in St. Louis, Mo. The matters in controversy are the rents and issues of this property from June 29, 1927, to January 16, 1928, during which time the property was operated by a receiver appointed in bankruptcy proceedings brought against the mortgagor, Buckingham Realty Company. This second mortgage was in default prior to June 29, 1927, and proceedings in foreclosure by advertisement had been initiated, and the sale was to have been held on June 29, 1927. On June 27th, however, a petition in bankruptcy was filed against the Buckingham Realty Company, and on that date the court appointed a receiver and entered an order enjoining the foreclosure sale. The receiver so appointed remained in possession of the property until January 16, 1928, when, by leave of court, the property was sold at foreclosure under the second mortgage.

At the time of the foreclosure there was due for the principal loan and simple interest, the sum of $65,443.88, besides the sum of $20,422.46, advanced by the mortgagees for taxes and insurance on the property for the years 1926 and 1927. At the foreclosure sale the property was bought in for the mortgagees for $50,000, the purchaser being an employee of the second mortgagee and one of the appellants herein. During the receivership no taxes were paid on the property, and no interest was paid, either on the second mortgage or the underlying first mortgage. The mortgage, which is in the form of a trust deed, describes certain real estate, "together with all buildings, improvements, furniture, fittings, furnishings, fixtures, equipment and machinery erected or to be erected thereon, and the appurtenances, hereditaments, rents, issues and profits thereto belonging," and provides that, in case of default, the trustee therein named shall be entitled to immediate possession of the property, either directly or through a receiver, and shall have the right to control, manage, and operate the same "and collect the revenue therefrom, and after the deduction of expenses incidental thereto, shall apply the revenue therefrom to the payment of that portion of the debt then in default or for the purpose of securing the performance of the obligations then in default," etc. It is also provided in the mortgage that the mortgagees might make advances of money for the purpose of making payments or performing or securing the performance of any other obligation by the mortgage undertaken to be made or performed by the mortgagor, and these obligations included the payment of taxes and insurance.

Immediately upon the appointment of a receiver and the entry of the order restraining the foreclosure, counsel for the second mortgagees advised the receiver by letter, of the defaults existing and of certain provisions of the mortgage, and requested the separation of the accounts of the Buckingham Hotel from the accounts of the Annex Hotel, and the application of the revenues from the Buckingham Hotel to the payment of the debt secured by the mortgage. This letter, among other things, contains the following:

"Under the terms of both of these mortgages, the delinquency in the payment of taxes constitutes a default, which default gives to the trustee under the mortgage the rights as specified therein.

"One of these rights is specified in Section XVII, Subdivision B of the mortgage,

which therein provides that, in case of a default—

" 'The trustee shall be entitled to immediate possession of the property * * * and shall have the right to control, manage and operate the same and collect the revenues therefrom, and after the deduction of expenses incidental thereto, shall apply revenue therefrom to the payment of that portion of the debt then in default, or for the purpose of securing the performance of the obligations then in default.'

"Under this provision, as well as under the ordinary rules of equity, the revenues of this hotel should be applied in making good the existing defaults under the mortgages and to the payment of the principal and interest of the mortgage debts.

"I do not know definitely, but I understand that in the past, revenues of this hotel proper have been used for other purposes in connection with the affairs of the Buckingham Realty Company, and that the accounts of the Buckingham Hotel and the Buckingham Annex have been intermingled, with the result that, frequently the earnings from the Buckingham Hotel, which is subject to the mortgages above described, have been used to pay the operating expenses and carrying charges of the Buckingham Annex.

"In view of the existing defaults under the mortgages, such a procedure violates the contract rights of the mortgagees.

"To insure the protection of those rights, I therefore, request that, in your conduct of the affairs of the Buckingham Realty Company as its receiver, you segregate the revenue from the Buckingham Hotel and the revenue from the Annex, or any other properties, and apply all such revenues to the curing of the existing defaults and to the payment of the principal and interest of these mortgage debts, as they accrue.

"Will you advise me that such procedure will be followed by you as Receiver, or, if you have any doubt about the propriety of it, please let me know, and I will file with the court a petition for the directions of the court to the receiver in this matter."

The receiver promptly answered this communication, advising that the request that the accounts of the Buckingham Hotel main building and the annex be kept separately met with his approval and that he would proceed accordingly.

On September 15, 1927, the mortgagees filed petition for leave to foreclose their mortgage, which on October 1st was denied

without prejudice. On October 24, 1927, petition was filed, requesting the application of the rentals in accordance with the provisions of the mortgage, which motion does not seem to have been passed upon. On December 3, 1927, a motion was filed to vacate the restraining order and for leave to foreclose, and this motion on December 5, 1927, was again denied. On December 17, 1927, a petition was filed for leave to foreclose, which motion was on that date granted.

When the receiver surrendered possession of the property, he then had cash on hand in the sum of $27,480.56, derived from operating the Buckingham Hotel during the preceding six months, but he had not paid either the taxes on the property nor the interest on the mortgages, although he carried these items as liabilities. The cash balance of the Buckingham Realty Company at the time of the appointment of the receiver was $348.05, leaving a net balance of $27,132.51, and it is this fund which is the subject of this controversy, the appellants contending that the receiver would not have received these funds had their foreclosure not been restrained, and that the issuance of the restraining order and the appointment of the receiver carried with it the obligation on the part of the court and its receiver to apply the rents and issues, in accordance with the provisions of the mortgage, to the mortgage debt; in other words, that the receiver took the property subject to the liens thereon and the obligations of the mortgagor with reference thereto. On March 26, 1928, appellants filed their petition for an order directing the receiver to pay them this $27,480.56, after deducting therefrom whatever allowance might be made by the court to the receiver for his services, and to turn over to them the accounts receivable described in their petition, in the sum of $5,496.56, so that the same might be applied to their reimbursement on account of their mortgage debt and the interest accruing thereon and on account of advances made by them for taxes accrued and paid while the property was in the possession of the receiver. This petition was heard May 5, 1928, at which time the petitioners, in support of their petition, put in evidence their mortgage; the notice of their foreclosure sale advertised for June 29, 1927; the order restraining the foreclosure; the order appointing a receiver; letter from the attorney for the petitioners to the receiver, dated June 29, 1927, hereinbefore referred to, and the receiver's reply thereto; petition for leave to foreclose, filed September 15, 1927, and order denying same; motion filed December 3, 1927, for leave to

foreclose, and order denying same; petition for order on the receiver to apply the rents in accordance with the provisions of the mortgage, filed October 24, 1927; statement of receipts and disbursements, filed by the receiver, with final report of the receiver and statements thereto attached; application for leave to foreclose, filed December 17, 1927, with order granting same, and proof of foreclosure sale held January 16, 1928. In addition to this documentary evidence, proof was submitted showing that the total amount due at the time of the foreclosure was $85,806.34, which amount included, among other items, taxes and interest paid by the mortgagees, and that on the sale the property was purchased on behalf of the mortgagees for $50,-000, leaving a deficit in the sum of $35,000. The attorney for the petitioners testified that on three occasions prior to June 29, 1927, he made demand on the mortgagor for possession of the property on behalf of the second mortgage holders. The court, by an order entered January 19, 1929, nearly eight months subsequent to the hearing, denied the petition, but ordered the receiver to pay the petitioners $5,711.47 on account of taxes and insurance on the property for the period from June 29, 1927, to January 16, 1928, during which the property was in the possession of and was being operated by the receiver, holding that the mortgagees under the second mortgage were not entitled to the rents and profits accruing from the mortgaged property because they had not taken possession of the property until January 16, 1928, and all the rents and profits had accrued prior to that date, and that they had never asked for a receiver and had never demanded and were never refused possession.

This is one of the orders presented on this appeal. At the very threshold we are confronted with a motion for a dismissal of the appeal. As to this order it is contended that the appeal, not having been taken within thirty days after its entry, was too late. It appears, however, that, within thirty days from the date of its entry, a petition for rehearing was filed, was entertained by the court, and denied on March 22, 1930. The order, because of the pendency of this petition for rehearing, did not become final until the denial of the petition for rehearing, March 22, 1930. Aspen Mining Co. v. Billings, 150 U. S. 31, 14 S. Ct. 4, 37 L. Ed. 986; Kingman & Co. v. Western Mfg. Co., 170 U. S. 675, 18 S. Ct. 786, 42 L. Ed. 1192; United States v. Ellicott, 223 U. S. 524, 32 S. Ct. 334, 56 L. Ed. 535; Cherokee Nation v. Whitmire, 223 U. S. 108, 32 S. Ct. 200, 56 L. Ed. 370; Davis v. Livingston (C. C. A.) 13 F.(2d) 605; In re McCall (C. C. A.) 145 F. 898; United States Ship B. E. F. Corp. v. Galveston Dry Dock & C. Co. (C. C. A.) 13 F.(2d) 607; Chicago M. & St. P. Ry. Co. v. Leverentz (C. C. A.) 19 F.(2d) 915. The appeal was perfected within thirty days following the entry of the order denying petition for rehearing. It is urged, however, that the petition for rehearing was improper or irregular and hence did not extend the time within which an appeal must be taken. No objection was made to the form of the petition for rehearing, nor was any motion made to strike it, but it was heard by the court on its merits. The objection urged to the form of the petition is therefore not now available. As to the order of January 19, 1929, the appeal was timely taken. The order of March 22, 1930, overruling the petition for rehearing was not an appealable order and need be given no further consideration. We also put aside as unnecessary to a determination of the issues involved, the question as to the appealability of the order of April 7, 1930, striking from the files the petition filed by the appellants for a reimbursement on account of payment of interest by them on the first mortgage.

As has already been observed, the mortgage in question specifically pledged the rents and issues of the mortgaged property. The validity and effectiveness of such a provision is not questioned, but it is urged first that there were no rents and issues derived from the property while it was being operated by the receiver. The receiver, confessedly, took over the bankrupt's property, subject to all the then valid existing liens. The receivership did not impair the pledge nor release the property or its income from the provisions of the mortgage. Atlantic Trust Co. v. Dana (C. C. A.) 128 F. 209; Security Warehousing Co. v. Hand, 206 U. S. 415, 27 S. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789. Had the receiver not taken the property, the foreclosure proceedings then pending would, in the regular course of procedure, have given the second mortgagees possession of it on the 29th of June, 1927. The rents and issues would, under the pledge provisions of this mortgage, have then gone to the mortgagees, and they might have applied them to the payment of the taxes and insurance. It constituted a part of the security for their claim. As the result of the receiver's conduct of this hotel property, he had cash on hand in an amount exceeding $27,000. As a mat-

ter of fact, his operations resulted in a loss to the estate, but this was a bookkeeping loss so far as the estate was concerned, because it was made up of a liability for taxes and insurance which was not paid by the receiver. In other words, the receiver operated the property, collected rents and issues therefrom, failed to pay the taxes and insurance, which under the terms of the mortgage the mortgagor was obliged to pay, and at the end of his stewardship turned over the property to the mortgagees, incumbered not only with the mortgages but the lien for the taxes, and in effect turned over to the general creditors the $27,000 derived from the property. The loss, therefore, in operating the property, was not borne by the general creditors, but was borne by the mortgagees, and the general creditors profited $27,000, less the allowance made by the court, by reason of this unprofitable conduct of the property.

We are of the view that the cash in the receiver's hands constituted, within the meaning of this mortgage, rents and issues, and it remains to consider whether or not the mortgagees took proper steps to entitle them thereto. It is argued, and the lower court was of the view, that they were not entitled to these funds because they had never acquired actual possession of the property, either directly or through a receiver, and that they had not made demand therefor. In the absence of a receivership, or other process by which the mortgaged property is in the control of the court, a mortgagee of real property would not be entitled to the rents and profits of the mortgaged premises until he had taken actual possession, or until possession were taken in his behalf by a receiver, or until he had demanded such possession. Grafeman, etc., Co. v. Mercantile Club (Mo. Sup.) 241 S. W. 923; Teal v. Walker, 111. U. S. 242, 4 S. Ct. 420, 28 L. Ed. 415; Freedman's Savings & Trust Co. v. Shepherd, 127 U. S. 494, 8 S. Ct. 1250, 32 L. Ed. 163; Atlantic Trust Co. v. Dana (C. C. A.) 128 F. 209, 219. The appointment of the receiver was not opposed by the mortgagees, and they at once, through their attorney, notified the receiver of the conditions of their mortgage and their claim upon the rents and issues, and requested that the rents and issues from this particular property be separately accounted for. This the receiver agreed to do, and in fact, he did keep separate account thereof. The mortgagees from time to time asked the court for permission to foreclose, which carried with it a request for possession, and asked the court to direct the receiver to apply these rents and profits to payment of the taxes, insurance, and interest. In effect the mortgagees made themselves parties to the bankruptcy proceedings, recognized the receivership, but never acquiesced in an appropriation by him of the rents and issues of the property to the use and benefit of the general creditors, but promptly and persistently insisted that these rents and issues be impounded by the receiver, and either be used in the discharge of the taxes and insurance or be turned over to them. While it is true these mortgagees acquiesced in the collection of these rents and profits by the receiver, they did so on the understanding that they were impounded and would be properly applied or accounted for, and it cannot be said that they ever acquiesced in an appropriation of them by the receiver on behalf of the general creditors. They were, of course, unable to take possession of the property from the receiver, except on an order of court, and the record in this case warrants the conclusion that the receiver was acting not only on behalf of the general creditors, in so far as this property was concerned, but was acting also in behalf of these mortgagees, and he collected and impounded these pledged rents and issues, keeping them separate from his other accounts for apparently no other purpose than to make them available as a part of the security under this second mortgage. By carrying on the business of this hotel company through a receivership, the court assumed the burden of administering the property and collecting the income for the benefit of whomsoever was entitled thereto. This is not a case where the mortgagor was permitted to remain in possession of the property and to receive and disburse the earnings, but is a case where a receiver was appointed, who, at the demand of the mortgagees, collected, impounded, and separately kept these funds. He was their receiver, and nothing was done by him with these funds during his stewardship inconsistent with their application to a discharge of the pledge, and hence it cannot be said that the mortgagees are precluded from asserting their rights thereto by having remained silent, or by having acquiesced in the possession of the property and the collection of the income by the receiver, because they were not collected for purposes other than the satisfaction of the mortgage debt. It was only by reason of the order appealed from in this case that such a disposition was made of any part of these funds. We are of the view that the mortgagees in effect intervened in the receivership proceedings in aid of their proceedings to foreclose, and this intervention operated to

charge all of the net income arising from the operation of the property by the receiver with the lien of their mortgage. As was said by this court in Atlantic Trust Co. v. Dana, supra, in an opinion by Judge Van Devanter, now Mr. Justice Van Devanter:

"It was not necessary that a new receiver be appointed under its bill, or that the existing receivership be formally extended to its suit. These were matters beyond its control. It is sufficient that after this assertion of its claim the existing receivership was continued, and the subsequent income brought within the court's control, that in the decree subsequently entered in the foreclosure suit, to which the water company and the receiver were parties, all questions going to the existence of the pledge and the right to enforce it at the time of the trust company's intervention in the receivership suit were settled and determined favorably to the trust company, and that this income is needed to satisfy the mortgage debt. The income was not something which could be dealt with or sold under the foreclosure decree, like the real and personal property covered by the mortgage, but, being money, or rights in action which were being converted into money, had to be impounded and preserved so that upon foreclosure of the mortgage it might be forthcoming under the pledge, and be capable of application upon the mortgage debt. It requires no further statement or discussion to show that the means employed for the enforcement of this pledge of income have been by a suit for foreclosure in a court of equity and other proceedings in that court consistent with the theory that the mortgage gave a lien upon the income and did not convey the title. As to the income earned subsequently to the trust company's intervention in the receivership suit, possession thereof was obtained through a receiver in a suit where the mortgagee was asserting a right to the income under its mortgage."

See, also, First Savings Bank & Trust Co. v. Stuppi (C. C. A.) 2 F.(2d) 822; Bindseil v. Liberty Trust Co. (C. C. A.) 248 F. 112, 115; Petition of Cox (C. C. A.) 15 F. (2d) 764; Hitz v. Jenks, 123 U. S. 297, 8 S. Ct. 143, 31 L. Ed. 156; Seibert v. M. & St. L. Ry. Co., 52 Minn. 246, 53 N. W. 1151.

So here, the receiver, while not appointed in a separate suit instituted by the mortgagees, was functioning on behalf of all creditors with due regard to priorities of claims and liens on the property of the bankrupt.

The mortgagees could not have assumed, under the facts as disclosed by this record, that the receiver was holding possession of these properties and collecting the rents and issues arising therefrom for any other purpose than to preserve them for the party entitled to them.

In Petition of Cox, supra, there was before the court an order requiring a mortgagee to turn over to the mortgagor's trustee in bankruptcy rents collected. The mortgagee, after the adjudication in bankruptcy, and without permission of the court, collected rents on the mortgaged premises. In the course of the opinion in that case it is said:

"The real question is, therefore, as to the nature and extent of an admittedly valid lien. Obviously the right of a mortgagee to enter and collect accruing rents is an important part of his lien rights, particularly when, as in this case, the mortgages are second mortgages. The gist of the petitioner's contention is that the filing of an involuntary petition (which may never result in an adjudication), without more, destroys, pro tanto, this right. It is not suggested that Thurston received in the aggregate from the rents now in controversy and the proceeds of the mortgage sales (made under permission of the court) more than the amount of his secured debt. The real contention is that he should forego a part of his security, apparently as a penalty for entering without obtaining permission of the court. But courts cannot create penalties. * * * But the mortgagee's right now attacked would not have been cut down by an attachment; if we assume an injunction, we must also assume that the court issuing the injunction would have been as careful to preserve the mortgagee's right in the accruing rents as the mortgagor's right of redemption. * * * To sustain the appellant's contention would be to hold Thurston's mortgage affected by the act in the teeth of section 67d, supra; it would amount to transferring a part of his property to or for the benefit of the unsecured creditors."

In Bindseil v. Liberty Trust Co., supra, it was held that rents collected by a trustee in bankruptcy from premises mortgaged by the bankrupt between adjudication and sale under foreclosure proceedings should go to the mortgagee under claim of deficiency, and not to the general creditors of the bankrupt, even though the mortgage did not contain specific provision that the mortgagee might collect the rents. In the course of the opinion in that case it is said:

"As we are dealing in this case with the equitable administration of bankrupt assets, where creditors' legal rights are preserved but where their legal remedies are lost and equitable remedies are substituted, equity requires that the new remedies be as effective as the old in protecting and enforcing such rights. We are of opinion, therefore, that rents, which have been collected by the trustee from the bankrupt's encumbered property, are applicable to the discharge of the debt for which the encumbrance was given as against debts due general creditors, if claim thereto be seasonably asserted."

To hold that the mortgagees had a legal right to these rents and issues under the provisions of their mortgage, but that they should be precluded from recovering same because they had not technically pursued a legal remedy is to overlook the fact that the property was in the control of a court of equity, and that equitable remedies commensurate with the legal rights of the parties should be available. To take from the mortgagees the property to which confessedly they are entitled under the pledge provision of their mortgage, and transfer it to the unsecured creditors of the bankrupt, appeals to us as harsh, inequitable, and unwarranted.

It is also urged that the mortgagees are not entitled to interest after the date of the filing of the bankruptcy petition, and that they are in effect filing a claim for the deficiency in the bankruptcy court. This contention is not sustained either by reason or the authorities. The mortgagees are not filing a claim for deficiency against this common property of the bankrupt's estate, but they are asserting a claim to the rents and issues accruing after the appointment of a receiver, on the theory that such funds never became a part of the bankrupt estate. In other words, they are asserting their rights against the security. Coder v. Arts (C. C. A.) 152 F. 943, 950, 15 L. R. A. (N. S.) 372; Coder v. Arts, 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Sexton v. Dreyfus, 219 U. S. 339, 31 S. Ct. 256, 55 L. Ed. 244. As said by this court in Coder v. Arts, supra: The property "was mortgaged for the payment of the interest as much as for the payment of the principal."

In view of the foregoing conclusions, it seems unnecessary to consider the other questions presented in briefs of counsel.

The order appealed from is therefore reversed, and the cause remanded for further proceedings not inconsistent herewith.