PRESTEX INC.
v.
The UNITED STATES.
No. 415–61.

United States Court of Claims.
July 12, 1963.

---

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

William L. Davis, with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

Plaintiff was awarded a contract on January 29, 1960, to supply the United States Military Academy with 25,000 yards of white duck cloth to be used in making summer uniforms for the cadets, for a total contract price of $16,447.50.

After testing a sample of the finished cloth, the defendant refused to accept delivery because the cloth failed to conform to the advertised specification.

Plaintiff now sues for damages for breach of contract, asking that it be reimbursed in an amount equal to the difference between the contract price and the resale price (approximately $10,000), or, in the alternative, that it be placed in the position it occupied before the transaction took place, with the amount of recovery to be determined pursuant to Rule 38(c).

The defendant moves for summary judgment, contending that it is not liable under an express contract because the agreement, being predicated upon a bid which was not responsive to the advertised specification, was invalid *ab initio* and that, alternatively, it is not liable under an implied contract because it re-

ceived no benefits from plaintiff's attempted performance.

The contract at issue involved the Academy's 1959 supply of the white duck cloth for summer uniforms, the technical description of which is stated in military specification MIL–D–1645.[1] This same material conforming to the same specification had been in use at the Academy at least since 1952, and plaintiff or its president had been identified with the source of supply since that date. In 1958, the plaintiff had fulfilled a contract for the Academy in compliance with specification MIL–D–1645.

The bid which resulted in plaintiff's contract was in response to a second invitation for bids, all bids (there were only two in both instances) having been rejected as too high in comparison with plaintiff's 1958 price. As customary, both invitations required that the material conform to military specification MIL–D–1645, and both of plaintiff's bids offered to furnish material conforming to that specification. However, in plaintiff's response to the second invitation it inserted with pen and ink an exception to the specification, the legal effect of which is the primary issue in this case. Plaintiff stated this exception to military specification MIL–D–1645 in the following words: "Bidding on enclosed sample $^{35}\!/_{36}$"." [2]

These cryptic words together with the sample constituted the exception in its entirety. Since the specification expressly provided for a width of 29½–30 inch-

---

1. Pertinent excerpts are as follows:

   "B. TYPE AND GRADE

      "B–1. Type—Duck, Cotton, White, 8.5 Ounce (U.S.M.A.) * * *

   "C. MATERIAL AND WORKMANSHIP

      * * * * * * * * * * * * *

      "C–1b. *Yarn*—The cotton used in the manufacture of the yarn shall be * * * spun into a single yarn for the warp and a four ply yarn for the filling.

      * * * * * * * * * * * * *

   "D. GENERAL REQUIREMENTS

      "D–1. Before production is commenced, unless otherwise stated in the invitation for bids, contract or order, a sample of the finished cloth shall be submitted to the contracting officer for approval.

      * * * * * * * * * * * * *

      "E–2. *Physical Requirements*—Finished material shall conform to the following minimum requirements:

| Weight Per Sq. Yd. | Thread Count Per Inch | | Breaking Strength Grab Method Pounds | |
|---|---|---|---|---|
| Ounces | Warp | Filling | Warp | Filling |
| 8.5 | 112 | 32 | 120 | 120 |

      "E–3. *Width*—The width shall be as specified in the invitation for bids.

      * * * * * * * * * * * * *

      "E–6. Finish—* * * The finished fabric shall contain not more than 2 percent sizing, * * *." [Def's Ex. 1.]

---

2. Plaintiff's bid, dated November 23, 1959, contained the following language: "DUCK, cotton, white 8.5 oz., 29½–30" (USMA) in accordance with MIL SPEC Mil–D–1645 dated 18 Nov. 1949 revised 5 April 1950 with the following exceptions: "Bidding on enclosed sample $^{35}\!/_{36}$"." [Def's Ex. 6]

es,[3] and since the sample enclosed was similar in appearance to white duck conforming to the specification, it was difficult to determine, without a laboratory test, that plaintiff's bid sample differed substantially from the advertised specification except as to its width which was not considered by the contracting officer a material deviation. However, it was lighter in weight, had a lesser thread count, and was only two-ply instead of four-ply as called for in the written specification.

It was on the basis of this second bid incorporating this sample that the contracting officer awarded the contract now sued upon. The contract was for 25,000 yards of white duck at a price of $.6579 per linear yard for a total contract price of $16,447.50. It provided that the cloth was to conform to specification MIL–D–1645 per sample submitted $35\%_{36}$ inches. The specification required the contractor to submit, before commencing production, a sample of the finished cloth to the contracting officer for approval.[4]

On April 11, 1960, plaintiff submitted the required "preproduction" sample, although it was hardly preproduction, since the initial and only production run in the manufacturing process had been for the entire contract quantity or 25,000 yards. There were no facilities at West Point for testing textiles, and hence plaintiff's "preproduction" sample was forwarded to a laboratory to determine whether the finished cloth proposed to be supplied would conform to specification MIL–D–1645.

The tests disclosed that the "preproduction" sample (and hence the bid sample[5]) failed to conform to the required specification with respect to weight, thread count, yarn for filling, and sizing content. When plaintiff was informed of these deviations from the specification, it replied that its intention always had been to comply with the sample, not with the specification. Plaintiff was then advised that the material submitted by it had been found inferior and unuseable for the purpose of manufacturing white uniforms for cadets' summer wear and that consequently the preproduction sample was rejected. Plaintiff was requested "to locate material meeting the specification requirements." This the plaintiff failed to do. It is defendant's position, therefore, that no valid contract ever came into existence. Plaintiff appealed this decision of the contracting officer to the Armed Services Board of Contract Appeals. This appeal was dismissed for lack of jurisdiction. On June 12, 1961, the Comptroller General decided that since the bid did not conform to the invitation there was no valid contract,[6] and, since the Government had not accepted

---

3. The contracting officer wrote plaintiff as follows on June 15, 1960:
   "Your bid was understood by this office to offer a variation from the specification in size only, * * *." [Def's Ex. 13.]

4. See item "D", note 1, supra.

5. On May 17, 1960, plaintiff wrote the contracting officer as follows:
   "* * * we never represented in our original bid that our cloth would meet military specification MIL–C [sic]–1645.
   "Our bid was made as per sample submitted and the subsequent award from the government includes this statement 'as per sample submitted $35\%_{36}$".' We therefore submit that the preproduction sample which we have submitted can only be compared to the original sample which was included with our bid. All the goods have been manufactured and processed for this

contract. We therefore must take the position that these are the goods which the Military Academy has purchased." [Def's. Ex. 12.]

6. The Comptroller General's decision contained the following language:
   "Our Office has repeatedly held that a deviation which affects the price, quality or quantity of an article offered is a major deviation which cannot be waived. 39 Comp.Gen. 570, 36 id. 251 and 30 id. 179. In our opinion the substitution of 2-ply yarn for 4-ply yarn and the reduction of the thread count from 112 warp and 33 filling to 91 warp and 28 filling are deviations affecting both quality and price. Moreover, the weight of 7.8 ounce instead of 8.5 ounce and the sizing content of 2.1 percent instead of a maximum of 2 percent might not be major deviations if considered alone, but added to deviations that are already major, they extend the degree

**371**

delivery of the nonconforming cloth, nor retained any tangible benefits from the other party, no recovery could be had on a *quantum meruit* basis. Plaintiff then solicited bids for the sale of the rejected material and, on July 24, 1961, sold it to the highest bidder at a price of $0.265 per yard for a total price of $6,832.56.

In moving for summary judgment, defendant argues that the effect of the various statutes and regulations pertaining to formal advertising in the letting of public contracts is that the contract awarded must be the contract advertised and that, if it is not, the Government is not bound, since defendant's contracting agent could not bind the Government beyond his actual authority.

On the question of validity of the contract, we are of the opinion that the defendant is essentially correct. It is a well recognized principle of procurement law that the contracting officer, as agent of the executive department, has only that authority actually conferred upon him by statute or regulation.[7] If, by ignoring statutory and regulatory requirements, he exceeds his actual authority, the Government is not estopped to deny the limitations on his authority, even though the private contractor may have relied on the contracting officer's apparent authority to his detriment,[8] for

the contractor is charged with notice of all statutory and regulatory limitations.[9]

Reviewing the facts of this case briefly, we find that the defendant advertised for certain material expressly required to conform to military specification MIL-D-1645. Upon the basis of this advertisement, the contracting officer awarded plaintiff the contract incorporating not only the named specification, but also whatever exceptions were implied in the like-appearing sample which plaintiff tied to its bid, the full import of which was not to be discovered until later. It is contended that in doing so the contracting officer violated specific statutory and regulatory requirements pertaining to the bid and award of public contracts and that, since plaintiff is charged with knowledge of these limitations on the contracting authority, the Government is free to disavow the contract, even though the plaintiff may have relied on it to its detriment.

The law applicable to the issue of validity is clear. The Armed Services Procurement Act of 1947, continuing previous policy, provides that Government contracts for the procurement of supplies shall be made by formal advertising [10] and that the contract shall be awarded to the responsible bidder whose bid conforms to the invitation.[11] Imple-

---

of variance even further and must be considered material. We must conclude that the contracting officer had no authority to waive deviations as great as these, and therefore he had no authority to award a contract on the basis of a bid which did not conform to the terms of the invitation.

" * * * Under competitive bidding procedures, a contract which is awarded on a bid containing material variances from the invitation is invalid and confers no rights on the purported contractor. United States v. Ellicott (1911) 223 U. S. 524 [32 S.Ct. 334, 56 L.Ed. 535]; New York Mail and Newspaper Transportation Co. v. United States (1957) [154 F.Supp. 271] 139 Ct.Cl. 751; Konig v. Mayor, etc. of Baltimore (Md.1915) 95 A. 478."

7. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

8. Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); Pine River Logging & Improvement Co. v. United States. 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164 [126 Md. 606] (1902); Filor v. United States, 9 Wall. 45, 76 U. S. 45, 19 L.Ed. 549 (1869).

9. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

10. 10 U.S.C. § 2304 (1958), as amended, 10 U.S.C. § 2304 (Supp. IV, 1959–62), which provides in pertinent part as follows:
"Purchases of and contracts for property or services covered by this chapter shall be made by formal advertising * * *."

11. 10 U.S.C. § 2305(c) (1958), which provides:
"(c) * * * Awards shall be made * * * to the responsible bidder whose bid conforms to the invitation and will

menting the general rule, the Armed Services Procurement Regulations require the contracting officer to reject any bid which fails to conform to the essential requirements of the invitation. This applies unless the invitation for bids authorized the submission of alternate bids, and the supplies offered as alternates meet the required specifications. Such an alternative is not present in the invitation involved in this case.[12] Rejection of irresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud.[13] Indeed, where the specifications in the invitation to bid are at variance with the contract awarded the successful bidder, the resulting contract may be "so irresponsive to and destructive of the advertised proposals as to nullify them."[14] Such a contract in effect would be one issued without competitive bidding and therefore invalid.[15]

We must conclude, then, that the contract which concerns us here is invalid and without binding effect on the Government if the plaintiff's exception to the specification was at such variance with the advertised proposals as to nullify them.

The Comptroller General has many times considered the legal effect of deviations from advertised specifications.[16] The rule generally applied in these situations is that deviations may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders.[17] A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered.[18] The pertinent question for us is whether plaintiff's sample represented a substantial deviation. Without question it did, certainly as to price and—almost as certainly—as to quality.

Plaintiff is of the opinion that there was no real difference between the cloth which it submitted as a sample (presumably identical to the finished cloth) and the specification cloth,[19] but the tests made on the "preproduction" sample completely refute this conclusion. Specification MIL–D–1645 required that the yarn for filling be four-ply and that the thread count per inch be 112 per inch for warp and 32 for filling. In comparison, the sample failed to comply as to weight

---

be the most advantageous to the United States, price and other factors considered. * * * "

12. Armed Services Procurement Reg. § 2–404.2 (1960), which provides:
   "(a) Any bid which fails to conform to the essential requirements of the invitation for bids shall be rejected.
   "(b) Any bid which does not conform to the specifications contained or referenced in the invitation for bids shall be rejected unless the invitation authorized the submission of alternate bids and the supplies offered as alternates meet the requirements specified in the invitation.
   *    *    *    *    *
   "(d) Ordinarily, a bid should be rejected where the bidder attempts to impose conditions which would modify requirements of the invitation for bids * * * since to allow the bidder to impose such conditions would be prejudicial to other bidders * * *."
   Although this section of the regulations was not promulgated until April 1, 1960, after the award of the contract on January 29, 1960 (but before the submission of the sample of the finished cloth on April 11, 1960), it is nevertheless pertinent since it was merely declaratory of the existing law.

13. United States v. Brookridge Farm, 111 F.2d 461, 463 (10th Cir., 1940).

14. United States v. Ellicott, 223 U.S. 524, 543, 32 S.Ct. 334, 339, 56 L.Ed. 535 (1912).

15. New York Mail and Newspaper Transportation Co. v. United States, 154 F. Supp. 271, 139 Ct.Cl. 751, 758–59, cert. denied 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed. 2d 260 (1957).

16. 30 Comp.Gen. 179, 181 (1950); 36 Comp.Gen. 251 (1956); 38 Comp.Gen. 508 (1959).

17. 30 Comp.Gen. 179, 181 (1950).

18. Ibid.

19. Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment, p. 7.

(only 7.8 ounce), thread count (warp 91 and filling 28), yarn for filling (two-ply), and sizing content (2.1 percent instead of a maximum of 2 percent). These deviations can hardly be termed less than substantial, with a direct effect on the quality of the cloth.

Furthermore, plaintiff admits that cloth conforming to the specifications was considerably more expensive to weave because the "very high sley of the fabric (112 threads per inch for the warp) made the cloth economically unfeasible to weave since a tremendous quantity of seconds would result." [20] Plaintiff was therefore awarded a contract for material cheaper than that advertised for, without the knowledge of other bidders, actual or potential, and to their unquestioned disadvantage.

To permit the contracting officer to accept a bid under these circumstances would render meaningless the whole procedure of letting public contracts on an open competitive basis. We therefore conclude that the agreement entered into between plaintiff and defendant on January 29, 1960, did not result in a valid contract.

Having nevertheless gone to the expense of manufacturing all the material required by the attempted contract and in reliance on it, plaintiff contends that in justice it is entitled to be reimbursed in an amount sufficient to restore it to a position of status quo. Plaintiff makes a cross motion for summary judgment on the issue of liability, with the amount of recovery to be determined under Rule 38(c).

Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.[21]

Nowhere is this more clearly demonstrated than in New York Mail and Newspaper Transportation Company v. United States,[22] decided by this court in 1957, which is the case upon which plaintiff relies in support of its alternate claim alleging in effect an implied contract entitling it to a *quantum meruit* recovery.

In that case, the New York Mail and Newspaper Transportation Company sued the Government for its breach of contract for the rental of pneumatic tubes in New York for the transmission of mails for the period dating from January 1, 1951, through December 31, 1960. The contract provided for an annual rent payable not on a rate per annum, but in an amount varying from year to year, depending upon operating and general expenses, and for the assumption by the Government of the cost of converting the system from DC to AC electricity.

After using the service for 3 of the 10 years stipulated in the contract, the defendant, on the basis of a report indicating that by discontinuing the tube system and using trucks instead the Post Office Department would save annually approximately $7,000,000, closed down the tube service in December 1953. It

20. Plaintiff's Petition, p. 3.

21. Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533 (1916); Clark v. United States, 95 U.S. 539, 24 L.Ed. 518 (1877); Douglas Aircraft Company v. United States, 95 Ct.Cl. 140 (1941); 33 Comp.Gen. 533 (1954); 21 Comp.Gen. 800 (1942).

22. 154 F.Supp. 271, 139 Ct.Cl. 751, cert. denied, 355 U.S. 904, 78 S.Ct. 332, 2 L. Ed.2d 260 (1957).

notified plaintiff that it considered the contract "null and void" because not let by proper competitive bidding; but added that if the contract was in fact valid it was thereby cancelled.

This court agreed with the defendant on the question of validity, holding that, since the contract did not meet the terms of the advertisement and was executed largely by negotiation, it was invalid. The court relied on Clark v. United States,[23] where the party performing under an unenforceable contract was said to be entitled to recover the fair value of his property or services received and used as upon an implied contract for *quantum meruit*. We held that the contractor was entitled to recover for his services rendered, but such recovery was not to be limited to a strict *quantum meruit* because there had been a *bona fide* purpose to render services to the United States under an agreement fully approved by the Postmaster General. This meant that in addition to what plaintiff was entitled to receive at the contract price for services actually rendered during the 3 years the contract had been treated as valid, including franchise taxes for that period and the cost of the power conversion which the Government had agreed to pay, it should be permitted to recover the cost of carriers purchased for use on the system.

Since the carriers were still in process of manufacture and were not to be installed until the latter part of 1954, almost a year after the rescission, plaintiff herein relies heavily on this item of recovery to substantiate its own claim. There is no difference, it argues, between a set of new carriers not installed and 25,000 yards of cloth made up but not delivered; if one is compensable, the other should be also.

The central fact of New York Mail and Newspaper Transportation Company, which plaintiff completely overlooks, is that for 3 years the United States had elected to treat the contract involved therein as valid and subsisting. It freely used the services promised with the full approval of the Postmaster General, and it apparently paid plaintiff its contract price without complaint. In truth, as to the years 1951, 1952, and 1953 the contract was completely executed on one side and susbtantially so on the other. The defendant at time of rescission was found to owe only for certain additional expenses analogous to termination expenses. In view of these facts it was reasonable for the court to treat the contract as severable and as ratified as to the 3 years already performed. As to the carriers, the central operative fact was not the particular items of expense found to be compensable, but the fact that the United States had received the benefit of services over a period of years for which plaintiff was entitled to be reimbursed. Whether or not a particular item was included in the over-all amount allowed is of little significance.

A review of the facts in the case at bar reveals that it is readily distinguishable from New York Mail and Newspaper Transportation Company. Plaintiff's contract was wholly executory, and nothing in defendant's conduct suggests a ratification. On the contrary, it repudiated the contract promptly upon testing the sample of finished cloth and discovering that it deviated from the advertised specifications. No part of the order was accepted or used by defendant; nor was it unjustly enriched in any other way.

It is inescapable that plaintiff's difficulties are the result of its own ill-advised actions. As a result of having had the material manufactured, it apparently considers the contract an executed one so far as it is concerned. We are unable to give it that legal effect, for production under the contract was expressly conditioned upon the submission and approval of a "preproduction" sample. Plaintiff chose to ignore this requirement of the specification.

Plaintiff invited the illegal award by submitting a sample—not called for by

23. 95 U.S. 539, 24 L.Ed. 518 (1877).

the invitation—which was misleading both in appearance and in written description and varied from the cloth that had been used for summer uniforms at the Academy for many years, a fact well known to the plaintiff. Accordingly, we conclude that the defendant is not liable for plaintiff's expense incurred in the manufacture of the material under the agreement.

Defendant's motion for summary judgment is granted and plaintiff's motion is denied. The petition is dismissed.