JOHNSON MANAGEMENT GROUP CFC, INC., Appellant,

v.

Mel. R. MARTINEZ, Secretary of Housing and Urban Development, Appellee.

No. 01–1145.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 17, 2002.

C. William Michaels, of Baltimore, MD, argued for appellant.

Brent M. McBurney, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Donald E. Kinner, Assistant Director. Of counsel on the brief was Jud E. McNatt, Attorney, Housing and Urban Development Georgia State Office, Office of Counsel, of Atlanta, GA.

Before NEWMAN, RADER, and SCHALL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCHALL. Opinion concurring-in-part and dissenting-in-part filed by Circuit Judge PAULINE NEWMAN.

SCHALL, Circuit Judge.

This case involves a dispute between Johnson Management Group CFC, Inc. ("JMG") and the Department of Housing and Urban Development ("HUD"). The dispute arises out of a Real Estate Asset Management ("REAM") contract under which JMG agreed to provide management and related services for single family, HUD-owned properties in DeKalb County, Georgia.[1] After HUD terminated the contract for default, JMG appealed to the HUD Board of Contract Appeals ("Board") under the Contract Disputes Act of 1978, as amended, 41 U.S.C. §§ 601–613 ("CDA"). In addition to challenging the default termination, JMG claimed that it was entitled to additional compensation under the contract. Following an evidentiary hearing, the Board sustained the default termination. *Johnson Mgmt. Group CFC, Inc.*, HUDBCA Nos. 96–C–132–C15, 97–C–109–C2, 99–2 BCA ¶ 30,520, at 150,-699, 150,706, 1999 WL 651557 (Aug. 4, 1999) (*"Johnson I"*). At the same time, the Board ruled that JMG was entitled to some recovery on its monetary claims, but that the amounts due JMG were to be offset against the unliquidated balance of advance payments that JMG owed to the government. *See id.* at 150,712. The Board also ruled that the government held a lien on equipment purchased by JMG for performance of the contract, as security for JMG's obligation to repay advance payments, and that the government was entitled to enforce its lien rights. *See id.* at 150,707 JMG moved for reconsideration of the Board's decision, asserting various factual, evidentiary, and legal errors. *Johnson Mgmt. Group CFC, Inc.*, HUDBCA

---

1. In the interest of convenience, we treat the parties in this case as bound by a single contract. In fact, the Small Business Administration entered into the REAM contract with HUD and then subcontracted its performance to JMG as a "socially and economically disadvantaged small business concern" under the set-aside program provided for in 15 U.S.C. § 637.

Nos. 96–C–132–C15, 97–C–109–C2, 00–2 BCA ¶ 31,116, at 153,677, 2000 WL 1528761 (Sept. 20, 2000) ("*Johnson II* "). The Board denied JMG's motion for reconsideration, *Johnson II,* 00–2 BCA at 153,-684, and JMG now appeals. Because the decision of the Board is free of legal error and is supported by substantial evidence, we affirm.

## BACKGROUND

Under the REAM contract, JMG was required to perform various property management services at specified HUD-owned properties. These services included property inspections, leasing and sales activities, rent collection, making improvements and repairs, keeping tax assessment records, and lawn maintenance. The contract was a firm fixed-price services contract, with the lawn maintenance services being treated as a cost-reimbursable item. *Johnson I,* 99–2 BCA at 150,701. The contract was for a period of one year, with up to four option years. *Id.*

The effective date of the contract was November 1, 1994. *Id.* Upon expiration of the base year on November 1, 1995, HUD exercised its option to extend the contract for a second one-year term. However, during the option year, it came to HUD's attention that JMG was failing to comply with contract requirements relating to the submission of subcontractor invoices for lawn maintenance services. *Id.* at 150,702. As a result, the contracting officer issued a cure notice to JMG. The cure notice called for JMG to submit accurate subcontractor invoices relating to lawn maintenance services by February 28, 1996. JMG responded to the notice in three separate communications, but failed to allay the contracting officer's concerns relating to the invoices. *See id.* at 150,702–03. In addition, several property inspections by HUD revealed that, contrary to what was suggested by submitted invoices, lawn maintenance at a number of properties had not been performed properly. *Id.* On July 8, 1996, the contracting officer issued a final decision terminating the REAM contract for default on account of JMG's failure to comply with the contract's subcontractor invoice requirements. *See id.* at 150,703.

Following the default termination, JMG presented monetary claims for previously submitted but unpaid invoices totaling $119,758.53. On February 6, 1997, the contracting officer issued a final decision asserting that the government held a lien on equipment purchased by JMG with advance payments under the contract and that, pursuant to that lien, HUD was entitled to demand return of the equipment under the provisions of the Federal Acquisition Regulations ("FAR") relating to advance payments. The contracting officer declared that HUD would withhold payment of JMG's monetary claims until JMG agreed to return the equipment. *See id.* at 150,704. JMG did not agree to return the equipment, and on May 21, 1997, the contracting officer issued a third final decision. In the decision, the contracting officer again refused payment of any of JMG's monetary claims until JMG returned contract equipment to HUD. *See id.*

JMG appealed to the Board, challenging the termination for default and seeking payment for contract work it allegedly had performed prior to the default termination. JMG also sought payment for the cost of liability insurance that it had purchased at HUD's request. Following a hearing, the Board sustained the default termination. As to JMG's monetary claims, the Board ruled that JMG was entitled to payment on invoices for services provided by JMG prior to termination of the contract. In its determination as to the amount owed JMG, however, the Board found that in the

case of a number of invoices, JMG was entitled to either no reimbursement or only partial reimbursement. In addition, the Board ruled that JMG was not entitled to reimbursement for the cost of liability insurance it had purchased at HUD's request. *Id.* at 150,708. At the end of the day, the Board upheld JMG's monetary claims to the extent of $34,641.33 for lawn maintenance work that HUD inspectors had found to be fully performed and to the extent of $43,859.65 for unpaid management services fees under the contract. *Id.* at 150,712.

The Board held, however, that the government was entitled to offset against amounts owed to JMG "the unliquidated balance of the advance payments owed to the Government by Appellant." *Id.* The Board also held that, as security for the repayment of advance payments extended to JMG under the contract, the government held a lien on equipment that JMG had purchased with advance payments. *Id.* at 150,707. Finally, the Board held that the government was entitled to "exercise any of the options available under the Advance Payments clause to recover an amount reflecting the unliquidated balance of the advance payments owed by JMG." *Id.* at 150,712. That meant that HUD was entitled to seek immediate repayment of the unliquidated balance of advance payments, to take possession of and sell the equipment on which it had a lien, and to apply the proceeds of that sale against the unliquidated balance of advance payments. Following the Board's denial of its motion for reconsideration, *Johnson II,* 00–2 BCA at 153,684, JMG timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

### DISCUSSION

We review the Board's decision under the standard set forth in the CDA. Under that standard, "the decision of the [Board] on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b).

On appeal, JMG argues that the Board erred in sustaining HUD's action terminating the REAM contract for default. It also argues that the Board erred in interpreting the contract as requiring that JMG repay the government for any outstanding balance on advance payments that it had received under the contract. *See Johnson II,* 00–2 BCA at 153,681. JMG further contends that the Board erred in rejecting its claim for reimbursement for the cost of liability insurance and in reducing the amount it was owed as reimbursement for lawn maintenance services in order to account for what the Board found to be improper and incomplete work. We address these contentions in turn.

### A. The Default Termination.

■ The government bears the burden of proof in establishing the validity of a default termination. *See McDonnell Douglas Corp. v. United States,* 182 F.3d 1319, 1329 (Fed.Cir.1999). We conclude that the Board's finding that HUD properly terminated the REAM contract within the parameters set forth in the default provision of the contract is correct and supported by substantial evidence.

The REAM contract incorporated by reference the FAR default termination clause titled "Default (Fixed–Price Supply and Service) (APR 1984)." 48 C.F.R. § 52.249–8 (1984). That clause provides in pertinent part as follows:

(a)(1) The Government may, . . . by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R. § 52.249–8. This provision allowed HUD to terminate the REAM contract for default after notice and a period of ten days for opportunity to cure if JMG failed to perform any provision of the contract.

The REAM contract contained several provisions relevant to lawn maintenance and payment for lawn maintenance. Service Item 15 of the contract required that "[m]owing . . . be performed approximately every fourteen (14) days but not more than twice in a one month period from April through September" and that mowing "be performed from October through March on an as-needed basis." Contract No. H04C94079306000, Exhibit 6A (Aug. 8, 1994); *see also Johnson I*, 99–2 BCA at 150,702. JMG subcontracted the lawn maintenance services to Foster Enterprises, the HUD-approved subcontractor, and later to T & T Lawn Maintenance. *Id.* at 150,702.

To facilitate reimbursement for subcontractor expenses, the contract included Contract Modification No. 4, which specified, among other things, the reimbursable costs of lawn services and the requirements for submitting invoices for cost-reimbursable items. *Id.* at 150,701–02. Section B–2 of the contract, as amended by Modification No. 4, provided that cost reimbursement would be based upon original subcontractor invoices with a mark-up of 15.7% for JMG to cover profit, administrative expenses, and other costs. *Id.* at 150,702. The unit cost for lawn maintenance services was fixed by the contract at $50 per initial visit and $25 per subsequent visit, with a slight increase over the option years. *Id.* Section M, Paragraph G–4 (titled "Accounting"), as amended, specified in pertinent part the following form for invoices:

When work has been accepted as satisfactory, the contractor shall submit for payment *the original of the subcontractor's invoice* and Form SAMS 1106, Invoice Transmittal, to each Field Office for payment to the subcontractor. . . .

All subcontractor invoices forwarded to HUD for payment shall contain the following information: . . .

(10) the date that work was completed (or that the items were received)

(11) Street address and . . . case number of the property on which work was completed

(12) Detailed description of the work performed

(13) Itemized pricing for all work performed . . .

(15) The original signature of the subcontractor or his or her agent

(16) The initials of the subcontractor or his or her agent next to any erasures or alterations on the invoice

Contract No. H04C94079306000, Modification No. 4 (Jan. 30, 1995) (emphasis added); *see also, Johnson I,* 99–2 BCA at 150,701–02.

In *Johnson I,* the Board held that "JMG's repeated failure to submit subcontractor invoices in strict compliance with the terms of the contract is a sufficient ground on which to terminate the contract for default because of its impact on administration of the contract." *Id.* at 150,705. The Board concluded that JMG had failed to comply with the accounting requirements of the contract. In particular, the Board found that many of the invoices JMG submitted for lawn maintenance work contained inaccurate information relating to dates of performance, description of work done, and itemized pricing. *Id.* at 150,701–02. The Board also found that JMG had submitted to HUD invoices that lacked subcontractor signatures and that did not have subcontractor initials next to changes. *Id.* at 150,702. The Board concluded:

> JMG's failures in this regard effectively obscured the fact that it was not paying Foster, the HUD-approved lawn maintenance subcontractor, the stated contract rate for [lawn maintenance] services. JMG's faulty invoices also obscured the fact that JMG was using another subcontractor, T & T, to perform some lawn maintenance services on the contract. Some of the JMG invoices billed HUD for work that was not compensable under the contract because lawn maintenance was not to be performed on a property as of the date of the sale closing on the property. JMG continued to list lawn maintenance services on invoices for some properties that had been closed months before.

*Id.* at 150,705.

The Board also concluded that JMG had been given an opportunity to cure its deficiencies in contract performance but had failed to do so. The Board found that the contracting officer had sent cure notices to JMG which highlighted the above performance problems. Specifically, the contracting officer's February 28, 1996 letter addressed JMG's lack of accounting controls and its failure to comply with the invoice submission requirements of the contract. *See id.* at 150,702–03. His March 28, 1996 letter stated that JMG had failed to respond to the earlier cure notice by re-submitting accurate and conforming invoices, *id.* at 150,703, and his April 30, 1996 letter repeated the request for conforming invoices and gave notice of a final opportunity to cure before termination for default, *id.* The Board determined that, at the time of the default termination, many of the problems identified in the cure notices had not been corrected. *Id.* at 150,705. In challenging the termination for default, JMG advances three main arguments.

■ First, JMG argues that the Board improperly relied on certain evidence that was submitted by HUD shortly before the hearing. JMG contends that the Board should have granted its motion *in limine* seeking to have the evidence excluded. The material at issue consisted of several HUD property inspection reports which revealed that lawn maintenance work was not being performed as claimed in submitted invoices. JMG sought to have these reports excluded from evidence because they were not disclosed by HUD in response to discovery requests for all inspection reports. *Johnson II,* 00–2 BCA at 153,678. As a result, JMG did not see the reports until 10 days before the Board hearing. *Id.* JMG argues that the Board incorrectly concluded that HUD's failure to disclose the inspection reports in its response to JMG's first discovery request did not result in prejudice.

■ "Procedural matters relative to discovery and evidentiary issues fall within the sound discretion of the board and its officials." *Curtin v. Office of Pers. Mgmt.,* 846 F.2d 1373, 1378 (Fed.Cir.1988). Accordingly, a discovery or evidentiary ruling of the Board will not be overturned unless "an abuse of discretion is clear and is harmful." *Id.* The Board, in its reconsideration decision, ruled that the denial of JMG's motion *in limine* and the admission into evidence of the late-submitted inspection reports did not constitute an abuse of discretion. *See Johnson II,* 00–2 BCA at 153,679. In particular, the Board noted that the government had not acted in bad faith and that its actions had not resulted in undue prejudice, as JMG had been given an opportunity to request additional time to examine and inspect the additional reports but had not chosen to do so. *Id.* We agree that the Board's denial of JMG's motion *in limine* was not an abuse of discretion.

■ JMG also argues that "whatever invoice problems HUD had with specific invoices for some lawn cutting activity … could have been worked out." However, JMG was given over three months, from the time of the first cure notice to the July 8th termination, in which to cure the cited deficiencies. This period was more than adequate to satisfy the requirements of the default termination clause of the contract.

■ JMG also points to various efforts it undertook to comply with the invoice submission requirements, including placing the invoices on disks and making several attempts to explain and correct discrepancies in past invoices. While these efforts are evidence that JMG may have tried to cure its deficiencies, they do not require us to conclude that the Board's ultimate finding that JMG failed to cure the invoice errors is unsupported by substantial evidence. In sustaining the default termi-

nation, the Board relied on its finding that copies of original subcontractor invoices, which JMG included with its response to the contracting officer's third cure notice, failed to meet contract requirements because the invoices were confusing, incomplete, and contained errors. *Johnson I,* 99–2 BCA at 150,703. JMG does not contest the deficiencies in the invoices. The Board also relied in part on the contracting officer's notice of termination, which stated as follows:

> Each submission raises additional problems, with changes in property addresses, dates of service, and types of cuts. These changes, on top of changes between the original submission, the April submission, and the May submission create a situation in which HUD is simply unable to discern which services, if any, were actually performed, and if performed, on which dates.

*Id.* JMG does not argue that its invoice submissions in response to cure notices met the requirements of the contract. The Board's conclusion that JMG failed to cure the deficiencies in invoice submittals cited by the contracting officer is supported by substantial evidence.

■■ Finally, JMG attempts to excuse its deficiencies in contract performance by asserting that Foster Enterprises, the HUD-recommended subcontractor for lawn services, was responsible for deficient lawn maintenance work, overcharges, and invoicing errors. This argument does not help JMG. A contractor is responsible for the unexcused performance failures of its subcontractors. *See Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 602 F.2d 950, 957 (1979) ("The contractor alone is responsible for the deficiencies of its suppliers and its subcontractors absent a showing of impossibility."); *Mary Rogers Manley,* HUDBCA No. 76–27, 78–2 BCA ¶ 13,519, at 66,248, 1978 WL

2465 (Oct. 25, 1978) ("The principle is well established that the prime contractor is responsible for unexcused failures of performance by its subcontractors."); *Emcee Constr. Co., Inc.,* DOTCAB No. 71–20, 71–2 BCA ¶ 8940, at 41,565, 1971 WL 994 (June 21, 1971) ("To be excusable, the delay must be beyond the control and without the fault or negligence of both appellant and its subcontractor or supplier."). For the foregoing reasons, we decline to disturb the decision of the Board sustaining the default termination of JMG's REAM contract.

B. *The Advance Payments Issue.*

■ As noted above, the Board ruled that, upon JMG's default, the government had the right to demand the repayment of unliquidated advance payments. The Board also ruled that the government had a paramount lien interest in equipment that JMG had purchased for performance of the REAM contract and that the government was entitled to seize the equipment, sell it, and apply the proceeds of the sale to reduce the balance of unliquidated advance payments. *See Johnson I,* 99–2 BCA at 150,707–08. The Board's ruling was premised on the proposition that HUD's advance payments to JMG gave rise to indebtedness on the part of JMG that could only be satisfied by either repayment or contract performance.

Pursuant to 41 U.S.C. § 255(a), a government agency is authorized to make advance payments to a contractor. The statute provides, however, that advance payments "may be made only upon adequate security." 41 U.S.C. § 255(d) (2000). The statute further provides that "[s]uch security may be in the form of a lien in favor of the Government on the property contracted for, on the balance in an account in which [advance] payments are deposited, and on such of the property

acquired for performance of the contract as the parties may agree." *Id.*

The requirements of section 255 are implemented by the FAR in the alternative advance payments clauses set forth at 48 C.F.R. § 52.232–12 (1984). Through Modification No. 1, the REAM contract between JMG and HUD incorporated the provisions of Alternatives II (APR 1984) and IV (APR 1984) of the FAR's Advance Payments clause. That meant that under the contract, advance payments up to a limit of $124,000 would be extended to JMG "upon submission of properly certified invoices." 48 C.F.R. § 52.232–12(a). The contract further provided that until JMG had "liquidated all advance payments made under the contract," all advance payments were to be deposited "in the Contractor's special bank account with the South Trust Bank." 48 C.F.R. § 52.232–12(b). None of the funds in the special bank account were to be commingled with other funds of JMG, and withdrawals could be made from the special account only by means of JMG checks countersigned on behalf of HUD. *Id.*

The concept of liquidation in the context of advance payments is relatively straightforward. The term "liquidate" is defined in Black's Law Dictionary as "to settle (an obligation) by payment or other adjustment." *Black's Law Dictionary* 941 (7th ed.1999). In order to "liquidate" an advance payments balance, a contractor must do either of two things: (1) repay the advance payments, or (2) perform contract work and then have the government apply to the outstanding balance of the advance payments the amount that otherwise would be paid to the contractor for the work. As explained in the provision of the Advance Payments clause relating to interest:

For the purpose of computing the interest charge—

(i) Advance payments shall be considered as increasing the unliquidated balance as of the date of the advance payment check;

(ii) Repayments by Contractor check shall be considered as decreasing the unliquidated balance as of the date on which the check is received by the Government authority designated by the Contracting Officer; and

(iii) Liquidations by deductions from payments to the Contractor shall be considered as decreasing the unliquidated balance as of the date of the check for the reduced payment.

48 C.F.R. § 52.232–12(f).

The FAR provision incorporated into the REAM contract provides for repayment of advance payments that have been made to a contractor:

At any time, the Contractor may repay all or any part of the funds advanced by the Government. Whenever requested in writing to do so by the administering office, the Contractor shall repay to the Government any part of unliquidated advance payments considered by the administering office to exceed the Contractor's current requirements [or the maximum amount of advance payments allowed under the contract].

48 C.F.R. § 52.232–12(d). The FAR further provides that "[o]n completion or termination of the contract, the Government shall deduct from the amount due to the Contractor all unliquidated advance payments and all interest charges payable." 48 C.F.R. § 52.232–12(e). In short, HUD's advance payments to JMG amounted to a loan, the unliquidated balance of which had to be repaid by JMG upon termination of the contract. Treating advance payments as a loan that must be repaid stems from the proposition that while the government may assist a contractor by extending it advance payments,

it is not empowered to give a contractor money. *See, e.g., Royal Indem. Co. v. United States,* 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) ("Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." (citation omitted)). Hence, the requirement that advance payments be repaid is mandatory. *See Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (cases recognizing that some requirements are mandatory).

As security for its advance payments to JMG, the government was given a lien on the advance payment funds in the special bank account, as well as on property purchased with those funds:

(h) Lien on Special Bank Account. The Government shall have a lien upon any balance in the special bank account paramount to all other liens. The Government lien shall secure the repayment of any advance payments made under this contract and any related interest charges.

(i) Lien on property under contract. (1) All advance payments under this contract, together with interest charges, shall be secured, when made, by a lien in favor of the Government, paramount to all other liens, on the supplies or other things covered by this contract and on all material and other property acquired for or allocated to the performance of this contract and on all material and other property acquired for or allocated to the performance of this contract.

48 C.F.R. §§ 52.232–12(h), (i). Thus, to the extent that unliquidated advance payments remained outstanding, the Government retained a lien on funds in the special bank account and a lien on JMG's equipment.

Under the REAM contract, in the event of a termination for default, HUD was given the right to "[w]ithdraw ... all or any part of the balance in the special bank account and apply the amounts to reduce outstanding advance payments and any other claims of the Government against the Contractor." 48 C.F.R. § 52.232–12(k)(2)(i). HUD also was given the right to demand immediate repayment "of the unliquidated balance of advance payments" and to "[t]ake possession of ... and sell ... all or any part of the property on which the Government has a lien under this contract and ... apply the net proceeds of the sale to reduce the unliquidated balance of advance payments or other Government claims against the Contractor." 48 C.F.R. § 52.232–12(k)(2)(iii), (iv).

When the FAR Advance Payments clause was incorporated into the REAM contract through Modification No. 1, however, the first contracting officer added the following special provision:

2. Liquidation of Advance Payments.

The payments advanced under this contract will be considered liquidated upon submission of invoices marked as paid by the suppliers. Invoices shall be for the items listed in the Use of Advance Payments clause.

Contract No. H04C94079306000, Modification No. 1 (Aug. 8, 1994). On appeal to the Board, JMG argued that, under clause 2, the advance payments that it had received from HUD were liquidated upon the withdrawal and expenditure of the advanced funds for the purchase of start-up equipment. Consequently, JMG's advance payments "indebtedness" to HUD was "re-

paid." In addition, as a result of the satisfaction of the indebtedness, HUD no longer held a lien interest in the contract equipment. *See Johnson I*, 99–2 BCA at 150,707. HUD argued in response that, despite the reference in clause 2 to the term "liquidated," the advance payments were not liquidated because JMG had not repaid the advanced funds. *See id.*

The Board rejected JMG's argument. In so doing, it ruled that, to the extent that clause 2 operated to liquidate the advance payments balance before the balance was repaid, it was void and would not be given effect. The Board stated:

The provisions of Contract Modification Number 1 ..., to the extent that they provide for the liquidation of the advance payments upon their withdrawal and expenditure for the necessary start-up equipment, are not binding upon the Government because the contracting officer was not authorized to consider the advance payments liquidated, absent actual repayment or discharge of the debt under the Advance Payments clause, FAR 52.232–12(d), (e) & (k), which was incorporated into the contract by Contract Modification Number 1.

*Johnson I*, 99–2 BCA at 150,707.

In ruling that clause 2 of Modification No. 1 was without force and effect, the Board relied, *see id.*, upon the well-settled principle that the government is not bound by the conduct of its agents acting beyond the scope of their authority. *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998) ("It is well established that the government is not bound by the acts of its agents beyond the scope of their authority."); *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1153 (Fed.Cir.1983) ("[T]he United States is not bound by its agents

acting beyond their authority and contrary to regulation.").

■ We agree with the Board that the contracting officer was not authorized to liquidate JMG's advance payments in the manner prescribed by clause 2. Allowing advance payments to be repaid simply by presentation of subcontractor invoices is squarely contrary to the FAR's Advance Payments clause. As explained above, the Advance Payments clause treats each advance payment as a loan that must be repaid, either directly or through contract performance.[2] Allowing a contractor to satisfy its advance payments indebtedness simply by purchasing equipment for contract performance would, in the circumstance of a default by the contractor, improperly convert what is a loan by the government to a gift.

■ On appeal, JMG does not dispute the proposition that the FAR's Advance Payments clause treats each advance payment as a loan that is satisfied only by either repayment or contract performance. Neither does JMG dispute the proposition that the government is not bound by the

acts of its agents that are contrary to statute or regulation. Finally, JMG does not argue that the contracting officer was authorized to agree to clause 2. Rather, JMG contends that the government is estopped from asserting that the contracting officer's actions were unauthorized, because JMG relied upon clause 2 to its detriment.[3] In making this argument, JMG relies on *Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 98 F.Supp. 757 (Ct.Cl.1951), and *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662 (1994). JMG's reliance on these cases is misplaced. Neither of them involved the situation that exists here: a contracting officer agreeing to a contract provision that directly conflicts with the requirements of the FAR. In *Branch Banking*, the contracting officer approved certain subcontract arrangements that were contrary to a provision of the prime contract. The government argued that, because the subcontracts violated a provision of the prime contract, it was entitled to withhold payment to the contractor of part of the amount claimed on subcontractor invoices.

2. Departures from the FAR are permitted. *See* 48 C.F.R. § 1.402 ("Unless precluded by law, executive order, or regulation, deviations from the FAR may be granted as specified in this subpart when necessary to meet the specific needs and requirements of each agency."). The FAR contemplates two types of deviations from its provisions: "Individual deviations," *see* 48 C.F.R. § 1.403; and "Class deviations," *see* 48 C.F.R. § 1.404. The contracting officer's insertion of clause 2 into the REAM contract involved an individual deviation because what she did affected "only one contracting action." 48 C.F.R. § 1.403. Section 1.403 provides that individual deviations "may be authorized by agency heads or their designees." A contracting officer is not authorized to deviate from the requirements of procurement regulations when the necessary authorization to do so has not been given. In such a case, any deviation from regulatory requirements is a violation of the regulations and beyond the

authority of the contracting officer. *See McDonnell Douglas Corp. v. United States*, 229 Ct.Cl. 323, 670 F.2d 156, 159 (1982). "Actions taken by [the contracting] officer beyond his authority are, of course, not binding on the Government." *Id.* at 159. In this case, JMG has not argued that the contracting officer obtained the required approval for the deviation from the Advance Payments clause embodied in clause 2. *See id.* ("Plaintiff has produced nothing to indicate that such authorization was granted or that proper notice was furnished, and we can take it that they were not given.").

3. JMG acknowledges that it "had knowledge" of the lien provisions of the Advance Payments clause. In any event, "government contractors are presumed to have constructive knowledge of federal procurement regulations." *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 780 (Fed.Cir.1993).

The Court of Claims rejected the government's argument. Although recognizing that "[t]he Government is neither bound nor estopped by the acts of its officers or agents in entering into an arrangement to do or cause to be done what the law does not sanction or permit," the court stated: "We find nothing in [the procurement statute at issue] expressly or by inference prohibiting the contracting officer from doing what he did in this case." *Branch Banking*, 98 F.Supp. at 766. Continuing, the court explained: "When the Government is acting in its proprietary capacity, its representative has authority to waive or modify a provision in a Government contract, and the Government may be estopped by such act of waiver." *Id.* In this case, the contracting officer did not merely waive a contract provision. Rather, she agreed to a contract clause that was squarely in conflict with the requirements of the FAR. *Miller Elevator* is no more helpful to JMG. That case, like *Branch Banking*, involved the issue of whether the government was estopped from challenging the waiver of a contract provision. It did not involve a contracting officer agreeing to a contract provision that conflicted with the provisions of the FAR. JMG's estoppel argument is without merit. The Board did not err in holding that the liquidation provision of clause 2 was not binding on the government and that the government was entitled to enforce the provisions of the Advance Payments clause that had been incorporated into the REAM contract.[4]

**C. Insurance Costs.**

 JMG argues that the liability insurance it purchased was a reimbursable item under the REAM contract which the Board should have included in the amounts it determined were owed under the contract. In its initial decision, the Board noted that Section H–1 of the contract, pertaining to insurance, stated that "[t]he premium costs of Insurance required by this contract and other forms of insurance that may be purchased by the Contractor for its protection ... shall be borne by the contractor and will not be reimbursed by HUD." *Johnson I*, 99–2 BCA at 150,708. Additionally, the Board noted that Proposed Modification No. 8, which would have amended the contract to provide for the reimbursement of insurance costs by HUD, was never agreed to by JMG. *Id.* As a result, the Board concluded that the contract did not provide for reimbursement of JMG's insurance costs. *Id.*

JMG argued in its motion for reconsideration that the record evidence established an oral agreement between itself and the first contracting officer to the effect that HUD would reimburse it for liability insurance if it would purchase it. *See Johnson II*, 00–2 BCA at 153,681. The contracting officer testified that she had agreed to add a provision to the contract that would have provided for JMG to be reimbursed for any subcontractor insurance costs that it incurred. However, the contracting officer did not draft such a provision until four months after JMG had purchased the insurance. *Id.* at 153,682. That provision was introduced, along with a number of other contract amendments, in proposed Modification No. 8, *see id.*, which JMG never signed. The Board con-

---

4. In spite of the contracting officer's unauthorized action, the REAM contract, as a whole, remained valid and enforceable. *See Urban Data Sys.*, 699 F.2d at 1154. Under these circumstances, the government was obligated to pay JMG for the services rendered, *to the extent consistent with the law.* In fact, JMG did receive payment for services rendered under the contract. At the same time, however, in the face of JMG's default, the government was entitled to rely on the applicable provisions of the Advance Payments clause.

cluded that the evidence of record was insufficient to prove that an enforceable oral modification existed. *Id.* at 153,683. JMG now challenges that determination.

JMG does not contest the general rule, upon which the Board relied, that an oral contract may not modify a written contract which is required by regulation to be in writing.[5] *See Mil–Spec Contractors, Inc. v. United States,* 835 F.2d 865, 869 (Fed. Cir.1987). Instead, JMG argues that the Board failed to apply an exception to that general rule created by *J.S. Alberici Construction Co., Inc. v. GSA,* GSBCA No. 12,386, 94–2 BCA ¶ 26,776, at 133,169, 1994 WL 65100 (1994). In that case, the General Services Administration Board of Contract Appeals ruled that where the standard form modification, SF–30, was only "a mere formality" and "not a condition precedent" to agreement, the failure to complete the written modification did not prevent the court from finding that an enforceable modification was created. *Id.* at 133,173. Aside from the fact that we are not bound by *Alberici,* its holding is limited to a narrow set of circumstances and cannot be broadly read, as JMG would have it, to cover all situations in which a contractor and a contracting officer agree generally to a modification but fail to reduce it to writing. As the Board pointed out in its reconsideration decision, the record suggests that details of the reimbursement remained to be worked out after the oral agreement was allegedly reached, including details as to whether JMG was to be reimbursed for general and administrative expenses associated with the insurance. *Johnson II,* 00–2 BCA at 153,682. The Board stated that

there is not sufficient evidence in the record, such as memoranda or other writings which set forth the specific terms of the agreement, or demonstrate a complete consideration of the issues, indicating that the parties viewed the written modification as a mere formality. Furthermore, there was not a sufficient meeting of the minds on the terms of the agreement to definitize it orally.

*Id.* On appeal, JMG does not .point to evidence which would suggest that the oral agreement was anything other than a preliminary understanding that the government would, on terms to be decided, reimburse JMG for its insurance costs. Under these circumstances, we are not inclined to view the contemplated written modification agreement as "a mere formality." We affirm the Board's decision to exclude JMG's insurance costs from the amount owed it under the contract.

### D. Reduction of Amounts Claimed for Lawn Maintenance.

■ JMG argues that the Board erred in reducing the amount it was owed under several unpaid invoices to account for improperly performed and otherwise incomplete lawn maintenance. Specifically, JMG argues that it was inappropriate for the Board to disregard invoices submitted without the original subcontractor invoice and that it was inappropriate to reduce submitted invoices on the basis of HUD inspection reports. These arguments are without merit.

■ As the trier of fact, the Board was entitled to weigh the evidence before it in determining the contract work that had

---

5. *See* 48 C.F.R. § 2.101: *"Contract* means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, *except as otherwise authorized, are in writing."* (emphasis added); 48 C.F.R. § 2.101: *"Contract modification* means any written change in the terms of a contract."

been completed and for which JMG had not received payment. The Board concluded that the naked invoice submissions, without an actual sub-contractor submission in support, were insufficient evidence that any landscaping work was performed. *See Johnson I,* 99–2 BCA at 150,710. This credibility determination was well within the discretion of the Board. Further, the Board was entitled to rely on HUD inspection reports as evidence of the extent to which lawn maintenance services were properly performed. We uphold the Board's determinations as to the amounts owed to JMG on its submitted invoices.

### CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed.

### COSTS

No Costs.

*AFFIRMED*

PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.

I concur in the judgment that the contract was subject to termination for inadequacies in connection with the lawn-mowing services. However, this decision raises another, far-reaching, issue.

My concern is with the court's holding that a government agency's error of law is the sole burden of the contractor, and that the government bears neither the responsibility for its error nor the obligation to correct it to a mutually acceptable alternative. Johnson Management has been assessed the full and costly consequences of the government's error, an error raised after contract performance and invoked as an added penalty of the termination. The Board, affirmed by this panel, simply excises the assertedly illegal contract provision, thereby significantly changing the

bargain. This result is as unjust as it is unsupportable in the law of government contracting.

The Board found that the contract provision concerning liquidation of advance payments is "contrary to law." That provision was negotiated among the Department of Housing and Urban Development, the Small Business Administration, and Johnson Management, a minority-owned small business. The contract is captioned "TRIPARTITE ARRANGEMENT." If the provision is in fact illegal—a matter open to substantial question—it cannot simply be deleted by one of the parties, thereby imposing a major liability on the contractor, indeed a liability unrelated to the basis of the termination. The now-impugned contract provision is:

Liquidation of Advance Payments

The payments advanced under this contract will be considered liquidated upon submission of invoices marked as paid by the suppliers. Invoices shall be for the items listed in the Use of Advance Payments clause.

The panel majority couches the issue as whether Johnson is required to return unliquidated advance payments; however, that is inaccurate. Johnson does not dispute the obligation to return "the unliquidated balance of the advance payments," as the majority recites. Nor does Johnson dispute the obligation to repay "any outstanding balance on advance payments that it had received," as the majority also recites. Johnson disputes only the postperformance requirement that he repay the advance payments that were fully liquidated in accordance with the liquidation details in the contract.

The government states that the liquidation provision was adopted in error. However, the contract was negotiated for HUD by an experienced contracting officer and reviewed by HUD supervisory

authority and legal counsel, with full participation of the SBA. Johnson states, without contradiction, that "as the contract was negotiated it was understood that advance payments were part of the overall compensation to JMG in exchange for a slightly lower contract price." The contract was performed for its initial one-year term without any challenge to the legality of this provision. No objection was raised to this provision when the contract was renewed. Only after dispute arose during the renewal term did the agency take the position that this provision was contrary to law. The Board agreed, stating that:

> The contracting officer's apparent agreement with JMG that the advance payments would be liquidated upon their withdrawal and expenditure for the necessary start-up equipment was an act beyond her scope of authority and contrary to law. Thus, to the extent that Contract Modification Number 1 and the memorandum provide for the liquidation of the advance payments without actual repayment or discharge of the debt, they are void ab initio and without binding effect on the Government.

99–2 BCA & 30,520 at 150,707. Ruling the provision "void ab initio," the Board held that the government is not bound to comply with the provision. However, the Board held Johnson Management to all of the contract obligations, whatever their relation to the voided provision and to the balance of mutual consideration that inheres in every contract.

If the contracting officer indeed exceeded her authority and violated the law, it is improper to place on the contractor the full and sole burden of the government's error. The remedy for unilateral mistake is not to absolve the side that made the mistake from responsibility for the consequences of its mistake, while placing the burden of the mistake on the innocent party. *See United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986) ("in many circumstances it would violate good conscience to impose upon the contractor all economic loss from having entered an illegal contract"). The *Restatement (Second) of Contracts* '153 explains that the result of a unilateral mistake as to a basic assumption is that the contract becomes voidable if the mistaken party does not bear the risk of the mistake and (a) the mistake makes enforcement of the contract unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake. However, the contract here was performed, and voiding the contract is not an apt remedy for a services contract, for "[a]voidance of a contract ideally involves a reversal of any steps that the parties may have taken by way of performance, so that each party returns such benefit as he may have received." *Restatement (Second) of Contracts* '158 cmt. b (1981).

Precedent provides guidance with respect to government error, and illustrates remedies that do not impeach the integrity of contracts. For example, in *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1186 (Fed.Cir.1988) the court held that "[i]f the contract is in violation of the DAR . . . then reformation is appropriate" to achieve compliance, not simply cancellation of the illegal provision. In *New England Tank Industries of New Hampshire, Inc. v. United States*, 861 F.2d 685 (Fed.Cir. 1988) the court held that if the contracting officer violated a restriction against departing from the FAR, the contractor is entitled to relief. In cases where the government has acted illegally or in error, the courts have not denied remedy appropriate to the circumstances. For example, in *USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed.Cir.1987) the court invoked estoppel against the government's

recovery of overpayments from the contractor, for the government remained silent while the contractor relied on the contract provision and "the contractor was not negligent and dutifully followed the terms of the contract." *Id.* at 626. *See also, e.g., LaBarge Products, Inc. v. West,* 46 F.3d 1547, 1552–53 (Fed.Cir.1995) (contract not illegal despite violation of procurement regulations by government). In none of these cases was the offending provision simply expunged, changing the balance of the contract. *See Prestex Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 373 (Ct.Cl.1963) ("No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason.").

The government's position is not supported by the cases on which it relies, which deal with situations where a government agent or employee gave erroneous advice. In *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), a benefits advisor misinformed Mr. Richmond about how his earnings would affect his annuity, and the Court held that despite his reliance on the misinformation he could receive no more annuity than the statute permitted. The Court stated, however, that "we need not embrace a rule that no estoppel will lie against the Government in any case in order to decide this case. We leave for another day whether an estoppel claim could ever succeed against the Government." *Id.* at 423, 110 S.Ct. 2465. Similarly in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), where a farm agent misinformed a farmer about the insurance that the farmer bought from the government, the Court held that the farmer could receive no larger payment for crop losses than the law allowed. The case at bar, however, is not a matter of incorrect advice by an ill-informed clerk. This is a formal government contract, negotiated by experienced contracting officers, fully approved and executed by authorized officials, a contract that contained an explicit provision about liquidation of advance payments; a contract that had been performed for the entire contract year and well into the renewal year without any challenge to the legality of this provision.

When the government enters into commerce, it is bound by the rules of commerce. *See Mobil Oil Exploration, Producing Southeast, Inc. v. United States,* 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") The government proposes on this appeal that although this contract provision was a mistake on its part, the government does not bear the consequences of its mistake. However, the laws of contract and the rules of fair dealing do not evaporate when the government is a party. When a contract provision becomes illegal, whether due to later-discovered error or statutory enactment, the party that produced the illegality is liable for the injury caused thereby. *See, e.g., United States v. Winstar Corp.,* 518 U.S. 839, 910, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

My colleagues suggest that Johnson should have recognized the illegality of the provision at the outset, even though neither HUD nor the SBA, nor anyone in their agency review and approval process-

es, recognized it.[1] At most, this argument invokes a theory of mutual mistake involving HUD, the SBA, and the contractor. Further, it is incorrect that an agency cannot adjust the provisions of the FAR to particular circumstances, or that no departure is ever permitted. *See* 48 C.F.R. '1.402 ("Unless precluded by law, executive order, or regulation, deviations from the FAR may be granted as specified in this subpart when necessary to meet the specific needs and requirements of each agency."); *see generally* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 71–73 (3d ed.1998). The innocent party is entitled to consideration of the nature and source of the legal error, and if reformation is in fact needed the innocent party should not be worse off, after contract performance, than if a contract with different terms had been entered upon.

The HUD contracting officer and the SBA contracting officer are signatories of the now-criticized contract modification. They surely are chargeable with knowledge of whether the FAR permits this procedure concerning advance payments.[2] Were the legal error as conspicuous as my colleagues state, the actions of these agency officials reflect not only serious incompetence but reckless disregard of duty. The panel majority, acknowledging that contracting officers may deviate from the FAR, faults Johnson for failing to prove that this contracting officer did not act without authorization. That burden is not on Johnson, for *prima facie* the agency's official action was authorized. Further, it

is not disputed that all necessary approvals were obtained by both HUD and the Small Business Association.

As I have observed, the parties were not prohibited from adopting the challenged contract provision. The government cannot simply assert error and escape the consequences thereof. *See Burnside–Ott Aviation Training Center, Inc. v. United States,* 985 F.2d 1574, 1581–82 (Fed.Cir. 1993) (explaining that *OPM v. Richmond* relates to statutory appropriations, and does not bar equitable estoppel or mutual mistake claims involving the United States). The panel majority's cavalier treatment of the integrity of government contracts disserves the government as well as those who undertake to serve it.

---

1. I take note that the dictionary definition and FAR clauses quoted by the panel majority do not appear in the contract. Also, this court's theory that the liquidation provision is plainly contrary to the FAR contradicts the government's position that the advance payments need not be repaid if the equipment is conveyed or if the contract had not been terminated for default.

2. Contracting officer Cannon's testimony that she did not know what "liquidated" meant is, simply, incredible; Cannon was a senior professional, Director of the Contracting Division. Also, the contract was approved by HUD legal counsel, who presumably understood the meaning of "liquidated."